# MARRIOTT & HARDESTY, ET AL. v. GIVENS.

1. A mortgagee, or *cestui que trust*, may proceed to foreclose a mortgage, or deed of trust, in a Court of Equity, although the deed confers a power of sale.

2. When a creditor procures a levy to be made upon personal property conveyed by mortgage or deed of trust, previous to the law day of the deed, the mortgagee, er *cestui que trust*, may file a bill to ascertain and separate his interest and that which remains in the debtor, in consequence of the stipulation that he shall remain in possession until the breach of the condition of payment.

3. There is no necessity for the mortgagee, or *cestui que trust*, to go into equity to protect themselves against a creditor of their debtor, who levies on the property covered by the mortgage, or trust deed, upon the expiration of the law day, as a claim then interposed under the deed will be sustained.

4. A creditor who alledges fraud in the conveyance of a debtor, by a mortgage or deed of trust, cannot be prevented from trying this question in a Court of law, before a jury.

5. A stipulation in a trust deed, to secure the payment of certain debts, providing that the debtor shall remain in possession of the property until a named day, and afterwards until the trustee should be required, in writing, by his *cestui que trust*, to proceed and sell, does not extend the law day of the deed beyond the time fixed for the payment of the debt; and if a levy is made after that time, by a creditor, the trustee may protect the property by interposing a claim under the statute.

6. The trustee, after the time fixed for payment by the terms of a trust deed, is invested with the legal title, and at law, is the proper party to contest the legal sufficiency of the deed, and a verdict for or against him, if obtained without collusion and fraud, is binding and conclusive on his *cestui que trust*.

7. When personal property is improperly levied on, the party claiming it cannot enjoin the creditor from proceeding at law, on the ground that another person has interposed a claim to it by mistake. The true owner has an adequate remedy at law, by suit, or by interposing a claim under the statute.

8. After the determination of a claim suit against a trustee, his *cestui que trust* is not entitled to re-examine the question of title, on the ground that he was a stranger to the claim.

9. When personal property, conveyed by a trust deed, is levied on by creditors of the grantor, and claimed by the trustee under the statute, his *cestui*

*que trust* is not entitled in equity to restrain the creditors from proceeding in the claim suits, upon the ground that he desires a foreclosure.

10. When real estate is conveyed by a trust deed, to secure the *cestui que trust*, he may proceed in equity to foreclose the trust, and other creditors who have levied their executions on the trust estate, are entitled to redeem and therefore are proper parties, defendants to the bill of foreclosure.—Query, as to the proper course if they contest the validity of the deed as fraudulent, and assert the right to determine this question in a Court of Law.

11. Under our course of practice, which does not permit a demurrer without answer, when an objection is sustained against a bill demurred to as multifarious, it is proper that the complainant should amend his bill, or at least be put to an election upon which ground he will proceed. Quere, as to the practice in an appellate Court if the objection is overruled, and the bill is heard upon all the distinct grounds.

12. When the claimant asserts an absolute title to slaves levied on as the property of a debtor, and the proof shows that a portion of these slaves were purchased with money or funds of the debtor, and that the bills of sale were taken in the name of the complainant, the possession remaining with the debtor, this is evidence of fraud.

13. The assertion by a *cestui que trust* against creditors, that the grantor in a trust deed is indebted to him in a larger sum than he is enabled to prove, is evidence of fraud, unless the suspicion of unfairness is removed by evidence.

Appeal from the Court of Chancery for the 39th District.

THIS bill was filed by William T. Givens, against certain execution creditors of Ed. Herndon, and the case made by it is as follows.

Herndon being largely indebted to Givens, made and executed two deeds of trust, conveying certain real and personal estate to one Jesse C. Cobb, upon trusts which will be recited hereafter; one of these deeds is dated the 20th, the other the 21st April, 1840. These deeds were duly recorded in the proper office. Afterwards, Marriott & Hardesty obtained a judgment against Herndon, and also against Cobb, the trustee, as partners, and procured an execution to be levied on the trust property, then remaining in the possession of Herndon, and also upon four slaves which were the idividual property of Givens. Cobb, as trustee, interposed a claim under the statute, to the trust property, and also, by mistake, to the four slaves belonging to Givens, supposing

them to be included in the trust deed. The claim thus interposed by Cobb, was decided against him ; and thereupon the property claimed by him was found subject to the execution. Givens asserts, that he was a stranger to these proceedings, and prays that the property covered by the trust deed may be subjected to the payment of the debts to which it was appropriated ; that Marriott and Hardesty may be enjoined from proceeding against the trust property ; and also against the four slaves, as well as upon the claim bond executed by Cobb and his sureties for their delivery.

Marriott & Hardesty, and Thomas A. Walker, are charged with fraudulently combining to effect a sale of the trust property, and with Herndon and Cobb are made defendants. Afterwards Givens filed an amended bill, in which he alledged the indebtedness of Herndon as amounting to $17,000, and that this indebtedness arose from the loan of funds in his charge, as the executor of one Mayberry, in the State of Tennessee, as well as from his own resources, and property sold to Herndon, who is his son-in-law. That he procured the deeds of trust to be executed to secure himself, fearing the consequences of the revulsion which then had recently occurred ; that the stipulation in the deeds that Herndon should remain in possession until the trustee should be required by Givens to proceed to sell, was induced, in part, by the relationship existing between him and Herndon, and from the fact that the situation of his daughter required the aid of some domestics. Under these circumstances, and the deeds having been duly recorded, he did not feel disposed to close the deeds so long as he was not called on to settle the estate of Mayberry. After the execution of the trust deeds, he ascertained that Bright & Ledyard of Mobile, had obtained two judgments previous to the execution of the deeds, one for $2,371, and the other for $203, besides costs, upon which executions had issued. These constituting a lien on the trust property, were discharged by Givens, and are insisted on as an equitable charge against the trust estate. It also alledges, Henry Burgess, for the use of Andrew Rankin, and Caleb Garrison had levied executions procured against Herndon, on the same trust property, as well as on the four slaves owned by Givens. That Cobb, as trustee, had claimed all the property levied on, committing the same mistake in each of the claims, with respect to the four slaves ; and that Giv-

ens had become Cobb's surety in the claim bonds, without being aware that the claims covered his own slaves : so soon as he became aware of the mistake, he himself interposed claims in all of the cases, in his own name, to the four slaves belonging to him ; which claims, as well those of Cobb as his own, remain undetermined, except that of Cobb against Marriott & Hardesty. Kemp and Bucky had also procured a *fi. fa.* to be levied on the same property, and after its return a *vend. ex.* which is in the sheriff's hands.

It further alledges, that Cobb has removed from the county of Benton, where the trust property was levied on, and is inefficient as a trustee, and incapable of protecting it from the combined assaults of the creditors.

It prays injunctions against the several named creditors, the removal of Cobb as trustee, and the sale of the trust property, in satisfaction of the debts due to the complainant, charging it with the amounts paid to discharge the incumbrances to Bright and Ledyard.

Afterwards a supplemental bill was filed, which alledges that Herndon, on the 9th day of January, 1843, was duly declared a bankrupt, and was discharged from his debts as such ; and that the said Herndon had become the purchaser of all the interest resulting to him under said trust deed, at a sale thereof made by his assignee.

The trust deeds, which were executed by Herndon only, recite the indebtedness to Givens, and the trusts, as follows, to wit: The one of 20th April, an indebtedness of $21,000, by notes, thus described—

| | | |
|---|---|---|
| One dated 30th October, 1838, at 12 months, | | $4,370 |
| "    10th    "    1839, at one day, | | 6,160 |
| "    15th June, 1839, at one day, | | 6,810 |
| "    11th January, 1839, at one day, | | 2,750 |
| A receipt, dated 16th January, 1839, | | 910 |

The property conveyed is, divers tracts and lots of land, one piano, two horses, two head of Durham cattle, all the household and kitchen furniture, and several slaves. "To have and to hold, &c. under the express stipulation, that the property mentioned as conveyed in trust, is to remain in possession of Edward Herndon until as hereinafter provided; that if the said debts shall not be paid against the 25th day of December, 1840, then when-

ever the said Givens, his agent, &c. shall require the said Cobb, in writing, to proceed in execution of the trust reposed in him, he shall immediately take possession of the property, and sell the same at public aution, to the highest bidder, for cash, at the court house door, after giving thirty days notice, and at three public places in the county, and after paying the expenses of the trust, pay the said debts to the said Givens; and if any thing remain, shall pay it over to the said Herndon; but if the said Herndon shall, in good faith, pay the said Givens the said debts, and interest, by the 25th day of December, 1840, then the deed was to be void.

The second deed recites the indebtedness of Herndon to Givens, which it is intended to secure, as a large amount due by promissory notes, as follows:

One dated 10th October, 1839, at one day, for      $6,160
   "      11th January, 1839, at one day,            2,750

The property conveyed in trust by this deed, is 12 slaves, and the trusts are in similar words as by the other deed.

All the defendants answered the bill except Cobb and Rankin. Such as are creditors, pray their answers may be taken as demurrers to the relief sought, and to the bill for want of equity; most of them deny all knowledge of the allegations of the bill, except as to the indebtedness of Herndon to them severally, and the obtaining judgment and execution. They also insist, that the deeds of trust are fraudulent and void, and that they were made with intent to delay, hinder and defraud creditors, themselves among the number. Some of them assert that there exists no real indebtedaess from Herndon to Givens, and that the latter never had the ability to become the creditor of his son-in-law, to the amount stated, either individually, or as the executor of Maberry, and that he has permitted Herndon to dispose of the trust property to pay his debts, when exorbitant prices could be obtained for it. Walker disclaims any interest in the subject matter of the suit. Marriott & Hardesty insist, that no distinction was made by the jury, between the slaves alledged by the complainant to be his own, and those which are called trust property. They also assert that Givens was active in aiding Cobb in carrying on the claim interposed, and once continued the suit on his own affidavit. They all deny fraud and combination, and pray to be dismissed with costs.

At the hearing, the complainant proved the execution of the deeds of trust exhibited; and that the same were duly recorded in the proper office, within thirty days afterwards.

It was also proved, by the production of the certificate, that Herndon was discharged as a bankrupt, as charged in the supplemental bill.

The evidence on behalf of the complainant, in support of the consideration for the deeds of trust may be thus stated:

1. A note dated 30th October, 1838, at 12 months, for $4,370 was produced, purporting to have been made by Edward Herndon, E. L. Givens, and Robert L. Lane, payable to James Cox and Wm. T. Givens, executors of J. A. Maberry, deceased. The hand-writing of the makers was proved before the Master; and other evidence, taken by deposition, established that it was given for the price of slaves purchased by Herndon, at the sale of Maberry's estate, and that the other makers were his sureties.

Cox, the other executor, proves that this note was in his possession in April, 1840, and that on the 20th November of that year, he put it in the hands of his co-executor, Givens.

2. As to the debt described in the deed as due by note, dated 10th October, 1839, at one day for $6,160, no note was produced by the complainant; but the deposition of Cox, the co-executor, establishes that a debt for the sum of $6,410, was due by Samuel V. Carnick and others, by note, and that he handed this note to his co-executor, Givens, who loaned it to Herndon. This note was dated 26th October, 1837, payable 12 months after date. The deposition of Hugh P. Carnick, one of its makers, proves the payment of $5,500 upon it, to Herndon, on the 5th November, 1838; to one Samuel McGee of $100, on the 17th January, 1839, and of $300 to W. C. Kelly, on the 7th February, 1839. A new note for $315 was executed to Herndon for the balance due after the former note, on the 8th June, 1839, and as Carnick, supposes $195 was then paid in money. All these payments appear to have been made at Sparta, Tennessee. These two items, to wit: the loan of the Carnick note for $6,410, and the one for $4,370, given for the slaves, are also proved by other witnesses.

3. As to the debt described in the deed as due by note, dated 15th June, 1839, at one day, for $6,810, there is no evidence whatever, unless that just stated relates to this, and not to the other.

4. A note dated 10th January, 1839, at one day for $2,750, was produced, purporting to be signed by Herndon and one Russel J. Allen, payable to Wm. T. Givens and James Cox, as executors of Maberry's estate. Allen states in his deposition that he executed it as Herndon's surety, and that he believes it was given for borrowed money. Edward L. Givens states, in relation to this note, that some time in 1839, or 1840, Herndon came to Alexandria, the residence of the witness, and Wm. T. Givens, and brought with him a blank, upon which were written the names of Herndon and Russel J. Allen. By the instructions of Herndon and Wm. T. Givens, the witness wrote above the signatures, a note, payable to Wm. T. Givens, as executor of J. A. Maberry, deceased, for $2,700, or thereabout. Witness understood, from both Herndon and Givens, that the note was given for money belonging to the estate of Maberry, and loaned by Givens to Herndon.

5. As to the debt described in the deed as a receipt, dated 16th January, 1839, for $910, the only testimony is that of Edward L. Givens, who says he has seen a receipt in the possession of Wm. T. Givens, which he understood, both from Givens and Herndon, was given by the latter for money collected by him in Sparta, Tennessee, and belonging to Givens, as the executor of Maberry. This receipt, as the witness believed, was for about $900.

The depositions of Joseph Davenport, and John F. Pate, taken in behalf of the complainant, declare, in answer to the cross-interrogatories, that they visited Alabama in 1843, and took from Wm. T. Givens a deed of trust, on lands and negroes, to secure Allen Campbell and William Morriss, who were Givens' sureties for his administration, as one of the executors of Maberry's estate ; this deed of trust was intended to cover the claim due from Herndon to the executor, or executors ; Pate holding Givens responsible, as the latter had made settlement for the amount, and Pate being the guardian of the minor heirs of Maberry. These witnesses, as well as Cox, the co-executor, speak of no other indebtedness from Herndon, than for the Carnick note, and the one made for the slaves purchased at the sale, and answer that they know of no other, if any such existed.

The depositions of Thomas R. Williams, Christopher Haynes, and William C. Kelly, established, that about the time of the execution of the trust deeds, Herndon had sent many of the slaves

conveyed by these instruments to the counties of Greene and Perry; that the two first named persons were employed as agents for the Bank at Rome, to pursue the slaves with an attachment; that they overtook the slaves, and levied on them in Greene county, in the possession of Kelly, and one Brown. Kelly left Benton county after the suing out the attachment, and before the execution of the deeds of trust, which however he had heard spoken of. He passed Williams and Haynes on the road, and was invested with the power to dispose of the slaves as he chose.

The charge, insisted on by some of the answers, that Givens permitted Herndon to deal with the property conveyed by the trust deeds, after the law day, in payment of his debts, is attempted to be sustained by the depositions of Thomas R. Williams, Christopher Haynes, and W. C. Kelly. The two first named state, that Herndon, in 1841, sold to the Bank of Rome, a tract of land of 300 or more acres, and six or seven slaves, covered by the deeds; that the contract was made in the presence, and with the assent of Givens, who executed a quit claim in writing, to the land, which was conveyed by Herndon. Kelly states the sale, by Herndon, of some five lots, on two of which were houses, and also, that the purchasers were informed they were covered by the deed, and that Givens would make titles. But he knew nothing of his own knowledge of any titles being made by Givens, or that he took any part in the sale.

As to the four slaves, which the bill asserts are the individual property of Givens, but claimed by Cobb, under a mistaken notion that they were included in the deeds of trust, there is no evidence of ownership on the part of the complainant. On the part of the defendant it was proved, by the deposition of Lawrence Brock, that he sold a slave named Henry, one of the three slaves, to Herndon, in February or March, 1841, and received payment from him in notes due to Herndon & Kelly. The bill of sale was made to Givens, at the request of Herndon. Kelly's deposition proves, that when Schuyler and Bill, two others of the slaves were sold at sheriff's sale, Schuyler was bid off by one Copeland, but paid for by Herndon; but who furnished the money, the witness did not know. Kelly bid off Bill, and took the bill of sale in his own name. He furnished half the money, and Herndon the other half. Afterwards, he sold the slave to Givens,

and executed a bill of sale to him ; both these slaves have remained in Herndon's possession ever since the sheriff's sale. What consideration was paid by Givens to Kelly, is not stated by the witness.

At the final hearing, the Chancellor decreed a perpetual injunction as to the four slaves asserted by the bill to belong to Givens ; sustained the trust deeds, and directed the master to state an account of the indebtedness from Herndon to Givens, as well as the amount paid by the latter on account of the previous incumbrance arising out of the judgments in favor of Bright and Ledyard.

The master stated his account, consisting of these items :

1. The note given on account of the purchase of slaves, with interest, $5,562.12.

2. The sum due for the loan of the Carnick note, and interest, $8,621 45.

3. The amount of the note for two thousand seven hundred and fifty dollars, and interest, $3,960 67.

4. The amount paid on the prior incumbrances of Bright & Ledyard, $1,708 23.

The defendants excepted to this report, but the exceptions need not be stated, as the judgment here turns on other reasons. The report was confirmed, and a decree made directing a sale of the trust property, to satisfy the debts due to Givens.

The defendants appealed from this decree, and the creditors here open the cause entirely by the several assignments of error.

PRYOR and T. A. WALKER for the appellants made the following points :

1. There is no equity in the bill, inasmuch as the party had a clear remedy at law, which has been determined, so far as Marriott & Hardesty are concerned. Cobb represented the interest of his *cestui que trust*, and was competent to do so.

2. As to the four slaves asserted to be the property of the complainant, there is no reason whatever that the claim suits should not proceed.

3. The demurrers should have been sustained, 1. Because the bill is multifarious in confounding the remedy as to the four slaves with the remedy for the trust property. 2. Because improper parties are joined as defendants. There is no reason why one of

the creditors should be at the delay and cost of examining the matters in dispute between the complainant and other creditors. 3. The matters introduced into the amended bill are properly matters for a supplemental bill, and one good cause of demurrer appearing on the record, others may be insisted on in this Court. [Story's E. P. § 332, 443.]

4. The final decree is erroneous, 1. Because the complainant did not prove that the debts named in the trust deeds were due and owing to him. 2. The deeds were not made upon a sufficient legal consideration to support them as against creditors. 3. The deeds were not made in good faith.

The evidence describes debts which are essentially different from those stated in the deeds, and the bill contains no allegation of mistake. Conceding that an indebtedness on account of the Carnick note is made out, that is not the ground of the deed. The note for $4,370 is due to another person as well as the complainant, and no consideration is proved for the note of $2,750. The mere production of the note, without proof of the consideration, is not sufficient against a creditor. [McCain v. Wood, 4 Ala. Rep. 258 ; Smith v. Acker, 23 Wend. 653, 679 ; Hanford v. Aulden, 4 Hill, 271, 295; Russell v. Woodward, 10 Pick. 408 ; Blew v. Maynard, 2 Leigh, 29.]

5. But if the consideration of the deeds was sufficiently established, still they are void as having the effect to defraud creditors, and the proof is that they were made for that purpose.

1. On account of the pretended consideration of debts which had no existence, the bill alledges that the complainant *procured* the deeds to be executed. It was then a fraudulent attempt to cover the property of Herndon from other creditors. The bill alleges that the second deed was executed to secure several claims not embraced by the first, thus seeking to impose the recitals in the deeds as proof that there were different debts of the same amount.

2. The reservation of the use of the property to Herndon is such, that other creditors must be delayed. [Garland v. Rives, 4 Rand. 282 ; 2 B. Monroe, 239.]

As this possession was liable to be defeated at every moment, by Cobb, the trustee, it was not such an interest as the creditors could levy on and sell. [Otis v. Ward, 3 Wend. 498 ; 2 Cowen, 543 ; Harford v. Artcher, 4 Hill, 271.]

3. The deeds had the effect to defraud creditors then in existence, and were made with this intention. The proof shows they were made about the time when the Rome Bank sued out an attachment, and the property was run off. In addition to this, agents were invested with authority to sell the slaves, independent of the deeds. [Head v. Folenertack, 8 Watts,' 489 ; Damer v. Pickering, 2 Pick. 411 ; Davis v. McLaughlin, 2 Wend. 596 ; Collins v. Brush, 9 Wend. 189.]

4. Possession was retained by Herndon until the filing of the bill, 29th October, 1842, nearly two years after the law day, and there is no sufficient excuse or reason alledged or proved for thus favoring the debtor. This is evidence of fraud. [Camp v. Camp, 2 Hill, 623 ; Harford v. Artcher, 4 Hill, 271 ; Wiswall v. Ticknor, 6 Ala. R. 178; White v. Cole, 24 Wend. 131; Collins v Brush, 9 Ib. 198 ; Deene v. Eddy, 16 Wend. 522.] When a sale is impeached for fraud by creditors, it is the duty of the party claiming to remove all doubt of the fairness of the transaction. [Struper v. Echart, 2 Whart. 302.]

5. The bill should contain an allegation that the property was not more than sufficient to pay the debts secured by it; without such allegation the bill is fatally defective. [Widgery v. Haskell, 5 Mass. 144 ; Borden v. Sumner, 4 Pick. 265 ; Struper v. Echart, 2 Whart. 302.] If the deed as to the overplus, is fraudulent, it is void. [Murray v. Riggs, 15 Johns. 586 ; Meeker v. Cain, 5 Cowen, 547.]

Wm. P. Chilton and S. F. Rice, contra,

1. The possession remaining with the grantor, is consistent with the deed, and therefore no badge of fraud.

2. As a debtor may lawfully secure one creditor in preference to another, he may do so, notwithstanding the creditor, who is not to be preferred, endeavors to obtain a preference by attachment. The right to prefer cannot be impaired by any effort of the creditor, which is not complete at the time of conveyance.

3. The admission of Herndon, that it was his intention to delay the Rome Bank, cannot defeat the conveyance. [McCain v. Wood, 4 Ala. Rep. 258 ; Jones v. Norris, 2 Ala. Rep. 526 ; Haden v. Baird, 1 Litt. S. Ca. 340 ; Turpin v. Marksberry, 3 J. J. M. 627.]

4. It was competent for Givens to consent that Herndon should

sell portions of the trust estate, and credit the notes with the proceeds, and the notes were thus credited.

5. If the defendants here claim any thing out of the transaction with the Rome Bank, they must show an existing debt. [Lelan v. Hodges, 3 Dana, 439.]

6. But if the conduct of Herndon was improper, Givens is not connected with it, and therefore cannot be affected. [Garland v. Rives, 4 Rand. 282 ; Roberts v. Anderson, 3 Johns. C. 377 ; 1 Story's Eq. 373, 75, 119, 396, 399 note, 402, 406, 405, 407.]

7. The discharge of Herndon, under the bankrupt law, is a discharge of all his debts. [McDougald v. Reed, 5 Ala. Rep. 810 ; Bank. act, 2 sec. sec. 5.] And by the discharge, the lien of the creditors upon his estate was gone. When this matter was disclosed by the supplemental bill, the creditors became strangers to the suit, and had no right to proceed further. [Dunklin v. Wilkins, 5 Ala. Rep. 199.]

8. The bill seeks to separate the interest of the grantor, which was subject to levy, from that of the *cestui que trust*, which is not the subject of sale. [Williams v. Jones, 2 Ala. R. 770 ; Ib. 664.] So it seeks to remove the trustee as incompetent. The money paid to extinguish the prior lien of Bright & Ledyard, is a matter of equitable jurisdiction. [McMillan v. Gordon, 4 Ala. Rep. 716.] So is also the danger of wasting the trust fund. [Calhoun v. King, 5 Ib. 523.]

9. Neither the mistake of Cobb in interposing his claim, which in itself is a sufficient ground for relief, as the complainant may become liable on the bond given, nor the unsuccessful claim, will preclude relief, as a separation of the fund is necessary. (Callaway v. McElroy, 3 Ala. Rep. 304.)

. 10. The deeds are in the usual form, and of course not fraudulent *per se*. [Pope v. Wilson, January Term, 1845.] Nor are they shown to be fraudulent. [Steele v. Kinkle, 3 Ala. Rep. 352 ; Jones v. Norris, 2 Ib. 526 ; Oden v. Rippeto, 4 Ib. 68.]

GOLDTHWAITE, J.—This bill presents several distinct features, which it is proper to advert to, previous to the consideration of the questions raised upon the record. One of them is, that the complainant asserts an absolute title to four of the slaves involved in this controversy, and as to them seeks no ultimate disposition by the decree ; but only to restrain the creditors of a

third person from pursuing these at law, in satisfaction of their claims against him ; in other terms, the bill claims that the Court of Equity shall interfere to ascertain where the legal title in these slaves is.   The only assigned reason for this interposition is, that other personal estate, with some real property, was assigned by the debtor to a trustee as a security to the complainant for certain 'debts due to him ; and that this trustee, supposing these slaves to be conveyed to him by the deed conveying the other property, by mistake interposed a claim to them, in common with that other property, when all of it was levied on by executions at the suits of creditors of that third person ; and that the complainant was a stranger to this claim.   Another feature is, that personal as well as the real estate conveyed by the trust deed, has been levied on by the several creditors of the grantor of the deed, and the common object of the bill is to restrain those creditors from proceeding at law against any of the property thus levied on.   The reason for this interposition is assumed to arise out of the right which the complainant has to foreclose his trust deed, and that this right is interfered with or obstructed by their levies.

1.  We entertain no doubt that a mortgagee or *cestui que trust* may, in the first instance, proceed in a Court of Equity to foreclose his mortgage or deed of trust, although by the deed a power is conferred to sell.   [McGowan v. Br. B. at Mobile, January term, 1845.]

2.  Nor is it a question, when a creditor, previous to the expiration of the law day named in a mortgage or deed of trust, procures a levy to be made, that the mortgagee or *cestui que trust* may file a bill to ascertain and separate his interest from that which remains in the grantor, in consequence of the usual stipulation in the deed that he shall retain possession of the property, conditionally conveyed, until the forfeiture of the condition.   [Williams v. Jones, 2 Ala. Rep. 319.]   Indeed, it results from former decisions by the Court, that the interposition of a claim under the statute, by the mortgagee or trustee, will be ineffectual, if made before the expiration of the law day, as until that time the grantor is entitled to retain the property ; and this right of possession for a determinate period, is subject to levy and sale, and carries with it the equity of redemption.   The consequence of the premature interposition of a claim by the trustee, &c. under such circum-

stances, is, that the claim suit must be determined against the claimant, as his title is incomplete until a forfeiture of the condition of the deed. In view of this difficulty, we have several times suggested, that another effect of a premature claim, might be to conclude the title of the trustee, &c., upon the idea that the deed itself might be questioned as involved in such a suit. [Williams v. Jones, 2 Ala. Rep. 319; P. & M. Bank v. Willis, 5 Ib. 770.] However this may be, when the claim is premature, the case last cited establishes that the trustee, &c., when the law day has expired, may interpose his claim under the deed, although the levy was previously made. To the same effect is Magee v. Carpenter, 4 Ala. Rep. 469, and Davidson v. Shipman, 6 Ib. 27.]

3. The consequence of these decisions is, that there is no necessity for the mortgagee or *cestui que trust* to go into equity to protect themselves against the creditor of the mortgagor, unless the levy of his execution is made before the expiration of the law day. And the same rule seems to govern any creditor of the property when the mortgagee or trustee is invested by the deed with the power to determine the possession of the grantor in the property conveyed. (See cases last cited.)

4. It seems then to be clear, that the statute authorising a claim suit, invests the person whose property is levied on, with the right to have his claim determined at law; but here the converse of this matter is presented; and the question arises, whether a creditor alleging fraud in the conveyance of his debtor, can be prevented from trying that question in a court of law before a jury? By the course of proceeding, under the common law, this question was generally tried in a suit against the sheriff for a false return of *nulla bona,* if he omitted to levy; or in an action of trespass or trover, if he improperly levied on the goods of a third person; or it might be in an action directly against the plaintiff for directing the levy; or in trover or detinue against the purchaser at the sheriff's sale. In relation to real estate, the same question was usually tried in action of ejectment by the purchaser under the sheriff against the tenant in possession, claiming under the disputed title. Independant of these modes of ascertaining the fact of fraud, by a legal suit, the creditor was permitted, in equity, to set aside the fraudulent conveyance, as an obstruction to his legal right.

From these principles it seems clear that a creditor's right to

attack a conveyance for fraud, is one which may be asserted either at law or in equity, and we have been unable to meet with any adjudicated case which warrants the idea that its determination can be withdrawn from the forum which the creditor selects.

The levies, which it is the principal object of the bill to enjoin, seem, all of them, to have been made after the expiration of the term fixed by the trust deeds for the payment of the debts ; but it seems to have been supposed the property must necessarily have been condemned without reference to the question of fraud, from the circumstance that the deeds of trust both provide, not only that Herndon, the debtor, should remain in possession of the property until the law day, but also until the trustee should be required, in writing, by the complainant, to proceed and sell. Under ordinary circumstances, the trustee is considered as representing his *cestui que trust*, and rarely, if ever proceeds in opposition to his will ; the insertion of this stipulation was probably intended, at least such is the presumption, considering the deeds to be *bona fide*, to save the debtor, from the captious or vexatious interference of the trustee ; but we think it has no effect to open the law day of the deed from a definite to an indefinite period. It follows then, that the trustee was authorised, under the deeds, to interpose his claim to the property ; and at the time he did so there was no interest remaining in the debtor which could sustain the levy, always supposing the deeds as *bona fide*. [P. & M. Bank v. Willis, 5 Ala. Rep. 770.]

6. The trustee in a deed of the description before us, is invested with the legal title to the property conveyed, and is, at law, the proper party to contest its legal sufficiency; from this proposition it follows, that a verdict either for or against him, if obtained without collusion or fraud, is binding and conclusive on the *cestui que trust.*

The application of these principles will enable us to ascertain what and how much equity the bill under consideration contains.

7. As to the four slaves asserted to belong absolutely to the complainant, there is no equity whatever for the mistake of the trustee in claiming them, or even a wrongful claim by him could not affect the true owner. His remedy as to these, was either to pursue the common law modes of relief or he might properly propound a new claim, in his own name, after delivering the

slaves in discharge of the condition of the bond binding him to deliver them.

8. So likewise as to the personal property levied on at the instance of Marriott & Hardesty, there is no equity; because their right to have satisfaction out of it was ascertained by the verdict upon the claim interposed by the trustee under the deeds. According to what has already been ascertained, this verdict must have been predicated on the fact of the invalidity of the deeds, because, when the claim was interposed, there was no interest remaining with the debtor which could defeat the claim of his trustee.

9. The same want of equity is apparent as to all the personal property covered by the trust deed, and levied on by the other creditors. As to this, they had asserted a legal right which they are entitled to have determined in a Court of Law. The levies being made after the law day, there is no interest in the debtor which can defeat the claim on that account; and the only question involved is the validity of the deeds of trust. The determination of these suits in favor of the one or the other of the several parties, is decisive, so far as that creditor, or the complainant is concerned.

10. With reference to the real estate, we consider the bill as containing upon its face a proper and legitimate equity; and that all the defendants are properly made parties. We have before said, that a mortgagee or *cestui que trust* might come into equity to foreclose his mortgage, or deed of trust, even though a power to sell was one of the terms. The defendants are all judgment creditors, and according to many authorities, as such, would be entitled to redeem. [2 Story's Eq. § 1023; Story's Eq. Pl. § 193, and cases there cited.] Consequently they are proper parties to a bill to foreclose. It is to be remarked here, that with respect to the real estate, the bill does not alledge any matter from which it can be inferred that the creditors have enforced the levy upon this description of the property, or consummated it by sale; nor do they pray that they may, as to this, be permitted to contest the deed in a Court of Law, upon the ground of fraud. What would be the effect of such a prayer, and the course to be pursued, are matters which we decline to consider at this time.

11. Having ascertained what is the equity of the bill, we shall

proceed to the objection that it is multifarious. That it is so, to some extent, is apparent from what has already been said. There is no connection whatever between the trust property and the slaves to which an absolute title is asserted ; and whatever interest Herndon may have in the trust property, none in him is shown for these slaves. Multifariousness is the improperly joining in one bill, distinct and independent matters, thereby confounding them. [Story's Eq. Pl. 271.] But it is said, that although a bill is ordinarily open to objection, for this reason, where it contains two distinct subject matters, wholly disconnected, yet if one of them be clearly without the jurisdiction of equity for redress, the bill will be treated as if it was single, and the Court proceed with the matter over which it has jurisdiction, as if that constituted the sole object of the bill. · [Id. § 283.] In Varick v. Smith, 5 Paige, 160, the proper course is said to be, to answer as to the proper matter, and to demur to the other for want of equity; or the defendant may answer as to both and make the exception as to the latter at the hearing. It might be asked how it is if both the misjoined matters are of equity jurisdiction ?

Whatever may be the rule elsewhere, and in Courts which permit a demurrer separate from an answer, we think, according to our practice, when a demurrer for this cause is interposed and *sustained*, the complainant should be put to an amendment of his bill ; or, at least, to an. election for which cause he will proceed. ,  ··

It is difficult to say what the proper practice is in an appellate Court, when the cause has been heard after a demurrer for this cause *overruled*, and·determined upon both the distinct matters. As this matter is immaterial in this case, we shall leave it open, and proceed to the examination of the decree upon the merits.

12. As to the slaves claimed to be the absolute property of the complainant, it would, from the view already taken, be unnecessary to say any thing, but for the influence the assertion of this claim, if unfounded and fraudulent, may have upon the deeds of trust. There is a total deficiency of proof by the complainant to sustain the assertions of his bill ; but beyond this, it is clearly proved, as to one of the slaves, that it was purchased and paid for by Herndon, the debtor, with notes due to him and a partner ; and that the seller, at his request, made the bill of sale to the complainant. Another was purchased by Herndon at the sheriff's

sale, through the medium of a third person, and the third by him and another person jointly, in the name of the other person—Herndon paying one half of the money, and the slave being conveyed by the part owner to the complainant, without any proof of a consideration. Independent too of all this, the proof is, that all the slaves were in Herndon's possession for a long time, and until levied on. We are forced, by this evidence, to the conclusion, not only that the complainant is without just title to these slaves, but also, that he is asserting a simulated one, to withdraw Herndon's property from the grasp of his creditors.

It is not material to consider what influence evidence like this, in relation to one branch of the cause, will have upon the other, if that is apparently fair ; because, in our judgment, the deeds of trust were executed by Herndon as a cloak to cover his property, and if the complainant was innocent in the first instance, of a participation in that intention, it is more than questionable if he has not made himself a party to it by attempting to carry out the unlawful purpose.

13. The indebtedness of Herndon is declared by the deeds of trust, to be something over $20,000, by notes of different dates, in addition to a debt of $900 by a receipt. The only notes proved as exhibits, amount to little more than $7,000, in both cases excluding interest. No reason is assigned in the bill why the proper vouchers cannot be produced, and the testimony is equally silent. There is no attempt whatever to sustain the deeds as to the note of $6,800—the largest of the enumerated sums, and the evidence in relation to the other items, induces the suspicion, when critically examined, that nothing is due to the complainant individually, and nothing more than the amount of the notes exhibited to him as co-executor of Maberry. The co-executor is examined as a witness, and proves beyond a doubt that Herndon never had any transactions with the executors, within his knowledge, except the purchase of some slaves, for which the $4,370 note, *which is exhibited,* was given, and the loan by the complainant to him of the Carnick note, belonging to the estate, for $8,410. The $2,750 note, *not exhibited,* is payable to the complainant and Cox jointly, as executors of Maberry. How could this debt have become due to the estate without the knowledge of the co-executor, unless it was a security to the complainant for a portion of the Carnick note ? The witnesses say it was given, as

they understood, for borrowed money, and this is consistent only with the circumstance that the note of the estate was lent to Herndon. One of the same witnesses speaks of seeing a receipt in the complainant's hands, for money collected in Sparta, Tennessee, for $900. Where that receipt was at the hearing, does not appear, but the testimony of the Carnicks shows, that they paid their note at Sparta; and it is not a little peculiar, that $910 should be the precise balance due upon the note, after the principal payment. In the absence of the note which if given at all, was evidently so for the Carnick note, and the receipt, without any attempt to account for them, the inference is irresistible, that both are settled, and it is quite strong that the $2,750 note was given upon the final liquidation of these two items, as otherwise there is no explanation why the note was for money borrowed, and is made payable to the executors of the estate. We think it clear then, that the only judgment which the law authorizes us to pronounce upon the case, left in this condition by the evidence is, that the deeds describe debts which are not shown to be due; and the inference is proper, that they were executed, not for the *bona fide* purpose of securing debts actually due to the complainant, but that making use of that indebtedness and simulating it to be greatly more than it was, the chief intention was to hinder and delay creditors.

Without entering into the question, whether the complainant might avail himself of deeds executed with such a purpose, if in point of fact he was ignorant of it, we think he is entitled to no benefit, when he has been a party to the attempt to carry the purpose into effect, by pretending to be a larger creditor than he really is, or what produces the same effect—than he is able to prove himself to be. No rule is better established, or is more salutary in its effects, than that which declares it the imperative duty of the grantee in a deed attacked by creditors for fraud, to remove any suspicion of unfairness from the transaction. [Struper v. Eckart, 2 Whar. 302.] This has not been done in the present case, and the effect of such suspicion is to pronounce against the validity of the deeds.

Here our task, necessarily a painful one, ends, as the other questions are unnecessary to be determined; inasmuch as the supposed incumbrance of Bright & Ledyard cannot be tacked to an invalid deed; and the question arising out of Herndon's bank-

ruptcy and subsequent purchase of his supposed interest in the property conveyed by the deeds of trust is immaterial, if the bill is dismissed.

Such is our conclusion, and the decree here will be, that the Chancellor's be reversed, and the bill dismissed.