## ALLEN, ET AL. v. MONTGOMERY RAIL ROAD COMPANY, ET AL.

1. When the object of a bill is to reach equitable assets of a corporation in satisfaction of a judgment at law, and the assets are supposed to consist of the unpaid subscriptions to the capital stock, as well as the proceeds which may be produced on setting aside an alledged fraudulent deed executed by the corporation, the bill is not multifarious because individual stockholders are joined as defendants with the trustees and purchasers under the alledged fraudulent deed.

2. When stockholders in a corporation, after calls regularly made, are in default, a judgment creditor has a complete remedy at law against them, and therefore will not, for this cause only, be allowed to proceed in equity.

3. But as to such stockholders who are not in default to the corporation by reason of no call having been made, but whose subscriptions to the capital stock have not been paid, a court of equity has jurisdiction to compel payment at the instance of an execution creditor of the corporation.

4. When a corporation has provided under the terms of its charter to forfeit stock partially paid out, this dissolves the connection of the stockholders when shares are forfeited with the corporation, and a creditor cannot charge them with the amount unpaid.

5. When stock partially paid for or transferred by the stockholder *bona fide* to another person, and he is accepted by the corporation as the holder of the stock, this is a discharge of the original stockholder, and he cannot afterwards be pursued by a creditor.

6. An assignment by a rail road corporation actually insolvent, of all its estate for the security of certain bonds to be afterwards issued for the purpose of raising money to put a portion of the road in use, is not void *per se*, although it provides the estate shall be retained by the corporation until maturity of the bonds, and then sold in case of default for the benefit of the holders of the bonds, and afterwards of its creditors generally, who shall prove their demands, &c.; but the deed is imperative as a security, unless the bonds are actually issued to *bona fide* creditors before the lien of other creditors attach, or the property conveyed either by judgment or execution, as the estate is real or personal.

7. The circumstance that the corporation is actually insolvent at the time of making such a deed, and that all the estate conveyed by it is afterwards sold in a lump by the trustee, and does not produce a sum sufficient to pay the bond-holders, is not sufficient proof of fraud to avoid the deed; nor does the fact that the deed reserves the property from sale, prevent any execution creditor from selling the reversionary interest of the corporation at any time previous to the law day of the deed.

8. Although a corporation by a special provision in its charter is empowered to mortgage its effects, &c. for a particular purpose, this will not be construed as taking away or abridging its general power to execute a mortgage for the security of creditors.

9. A creditor cannot insist that a mortgage is void for the omission to register it, unless this ground is alledged in the bill—if alledged, the defendant has the right to reply notice to the creditor.

10. *Quere*—whether a sale will be set aside at the instance of a creditor interested in the sale, on the ground that the sale was at an under price, unless the creditor will offer to bid a larger sum: *Quere*, also, if a similar rule does not apply when the sale is in gross, and the assertion is, that a larger sum would be produced by a separate sale of each article.

11. The circumstance that purchasers of the effects of a corporation have surrendered them to another corporation created with the same or similar powers, does not by itself warrant the inference of an agreement before the sale thus to convey it.

Writ of Error to the Court of Chancery for the Eleventh District.

THE original bill in this case was filed the 22d May, 1841, by Wade Allen, and others, as judgment creditors of the Montgomery Rail Road Company, by judgments obtained in March, 1840, against said Company, and its several stockholders, who are sought to be charged for the amounts severally due by them on their subscriptions for stock, which it is

Allen, et al. v. Montgomery R. R. Co. et al.

alledged they have not paid, and the allegation of the bill being that the company has no assets, real or personal, out of which the complainants can have satisfaction of their several judgments and executions, the latter of which, it is alledged, have been returned no property.  The answer of the corporation admits the judgments, &c. as stated in the bill, and sets out, amongst other matters, that on the 7th of October, 1839, a meeting of its directors was convened for the express purpose of deliberating on the embarrassed condition of the company, and to devise ways and means to put a portion of the road in operation.  The company had then expended $450,000, and were then without the means of further prosecution.  The company deemed it an imperative duty alike to itself, to its creditors and to the public, to make every lawful exertion to procure the means to relieve its pressing and immediate embarrassments, to purchase such machinery and materials, and to pay for such work and expenses as were indispensable to the finishing and opening of for use, that portion of the road extending from Montgomery to Franklin. To effect these objects, it was deemed expedient to borrow money and pledge the property of the company for its re-payment.  The company issued its bonds on the 20th of November, 1839, for $50,000, accompanied with a mortgage or deed of trust, which is made an exhibit, and will be hereafter stated.  The bonds were redeemable on the 1st April, 1842, in sums of $1000 each, at 8 per cent. interest, payable semiannually, in April and October.  The deed of trust conveyed the entire assets of the company, including the road itself, to trustees upon certain trusts, which the company insists must be performed before it has any interest in the property conveyed.

All the stockholders who answer the bill assert either a full payment for the stock held by them, or that the company is indebted to them in a larger sum than is due to it for subscriptions.

In January, '45, the complainants amended their bill, and charged that the deed of trust set out in the answer of the corporation, was void in law, as made for the purpose of delaying, hindering and defrauding the creditors of the company—that no money in point of fact was ever borrowed by

the company, on the bonds issued by it, but the same were delivered by the president of the company to various persons unknown, not upon any loan of money, but either upon some other or no consideration—that the trustees named in the deed, knowing that no money had been borrowed on the bonds, advertised the property conveyed by the deed, and sold it to one B. S. Bibb for $50,000, that sum being greatly below its true value—that Bibb purchased the same for the company, or its officers, by reason of some private understanding between them, that the purchase should inure to the benefit of the company, and that nothing was paid to the trustees. It prays that the bond holders may be made parties and required to state the consideration of the bonds, that the trustees may answer to the circumstances of the sale, and that the sale may be set aside, and the property decreed subject to the claims of the plaintiffs. The amendment also charges, that the company issued notes or bills in express violation of its charter, and that the bonds, or portions of them, were issued to take up the bills so unlawfully put in circulation. The trustees, purchaser, and some additional stockholders, are made parties by the amendment.

A supplemental bill was afterwards filed, alledging that Bibb purchased for the use and benefit of the Montgomery and West Point Rail Road Co. and making that corporation, as well as Bibb and the trustees to the deed, parties. All the defendants answer the bill, and insist on the same matters of denial or defence. The following is the account they give of the transaction. After the execution of the deed of trust, the president of the company, by its direction, sold six of the bonds to C. P. Shannon—one to E. Ross Riddle—and one to Henry Nagle, in payment of debts due and owing to them as engineers of the company—ten to W. B. S. Gilmer—one to E. Holt—four to Wm. Taylor—three to Abner McGehee —and two to T. M. Cowles, for which the president received $20,000, in cash, which he subsequently applied under direction of the corporation, in putting the road in operation between Montgomery and Franklin. The company had contracted a debt with Rogers, Ketchum and Grosvenor, of about $14,000, and appropriated fourteen of the bonds for the purpose of paying them—but on their refusal to take the

bonds, they were sold as follows: six to Abner McGehee—two to N. E. Benson—two to C. T. Pollard—two to B. S. Bibb—and two to Jesse P. Taylor, for three notes, which were transferred to R. K. & G. in full payment. These notes were afterwards paid in cash. Four of the bonds were transferred to Henry Burden in payment of a debt due for spikes, and the three remaining to James Brooks, in part payment of a locomotive. In addition to this statement of the consideration, the denial is express, that none of the bonds were paid out for notes issued by the corporation. On the the 1st of April, 1842, the bonds remaining unpaid, the trustees were required by the holders to proceed and sell the property conveyed by the deed, and in accordance therewith, after giving the preliminary notice, did sell the entire property at public auction, in July, 1842. The whole of the property was offered together, for specie—but one bid was made, and it was knocked down to Bibb, as the purchaser. No money was paid at the sale, or afterwards, but the whole number of bonds was produced to the trustees, and each one credited with $1,000. Bibb, in this purchase, acted for himself, C. T. Pollard, T. M. Cowles, N. E. Benson, J. E. Scott, Henry Burden, Wm. Taylor, J. P. Taylor, Lewis Owen, W. B. S. Gilmer, A. McGehee, and Charles B. Shannon, who were then the owners and holders of forty-five of the fifty bonds issued. All of these persons, either in person or by proxy, attended the sale, and afterwards became the owners of the other five bonds. Having made various arrangements and sales between themselves, the entire number of bonds became the property of Bibb, Pollard, Owen, McGehee, Wm. Taylor, Scott, Cowles and Shannon, and the deed of the trustees was executed, conveying all the trust property to them. The purchase was made exclusively for their own benefit, and without any understanding that it should inure to the benefit of the company, or of the Montgomery and West Point Rail Road Company, which was not then in existence. The deed of trust exhibited, recites the resolution of the corporation of the 7th of October, 1839, to borrow $50,000, and to cause their bonds to be issued, and that in pursuance thereof, fifty bonds for $1,000 each were issued in

56

a particular form.   It then proceeds to convey to John Whit-
ing, James H. Taylor, and Charles Crommelin, a number of
tracts of land in the several counties on the line of the road,
between the county of Montgomery and the State of Georgia,
as well as in the State of Georgia; together with the ma-
chinery, depots, warehouses, works, engines, cars, received
and to be received, and all real and personal property of
whatsoever kind or nature, in any manner belonging to the
company.   The trusts declared by the deed are as follows:

1.  To receive and hold the premises conveyed for the spe-
cial purpose of securing and providing for the payment of
the said bonds, and to effect this, the trustees are empower-
ed, if the bonds are unpaid on the 1st of April, '42, to sell
the premises conveyed at public auction, for cash, after a no-
tice of ninety days, or so much thereof as should be sufficient
to pay the bonds outstanding.

2.  In the event of sale, after paying the bonds, or retain-
ing a sum sufficient to pay them, then to pay all creditors of
the company *pari passu*, and without preference, who should
present their claims properly authenticated, after sixty days
public notice.

3.   In case there should be a residue, then to pay the same
over to the president and directors of the company.

But all these were subject to the further trust, that the
company should remain in the possession of the premises, and
take the profits thereof, and apply the same towards the
completion of the said road, until default in paying the bonds
due on the 1st April, '42.

One of the stockholders, B. D. Harris, admits that he sub-
scribed for ten shares, amounting to $1000, and had paid but
$500.

All the defendants who answer demur to the bill, but the
demurrers are either general or assign for cause, that no case
for relief, as prayed, is made by the bill.   The evidence
taken in the cause, does not materially change the features
made by the bill and answers—that of the defendant how-
ever, shows the transfer or sale of the bonds, by which the
claim of Rogers, Ketchum & Grosvenor was discharged, was
on the 10th December, 1839, as the notes of the purchasers

bear that date. The other transfers were probably made earlier—though the time is not stated by the witnesses.

No evidence was taken in reference to the actual value of the property sold by the trustees, or as to whether it would have produced more if sold in distinct lots.

The chancellor dismissed the bills at the hearing, on the ground that the amendment made a new case, inconsistent with the original bill—that the complainants could not proceed in the same bill to charge the individual stockholders and the assets of the corporation—and that this defect was reached by the general demurrer.

T. WILLIAMS, J. A. ELMORE, and HEYDENFELDT, for the plaintiff in error, made the following points:

1. A creditor's bill may be so framed as to embrace two classes of cases—1, in aid of the execution at law to set aside an incumbrance, or a fraudulent transfer—2, to have his judgment paid out of choses in action or other equitable assets of his debtor. [Williams v. Hubbard, Walker's Ch. R. 28; Wilcox v. Cary, 9 Dana, 298; Halbert v. Grant, 4 Mon. 583; Brinkerhoff v. Brown, 6 John. Ch. 139; Cummings v. McCullough, 5 Ala. Rep. 339; Story's Eq. P. 120, 233, 409 to 413.

2. But if the amendment made the bill multifarious, it could be reached only by a special demurrer. [Story's Eq. Pl. § 458; 30th Rule of Prac. Dig. 616.] If the demurrer reached the defect, the party has the right to amend and elect on which point he will proceed. [Marriott v. Givens, 8 Ala. R. 710.]

3. The deed is void on its face—

I. Because by the charter of the corporation it could only exclude a deed creating a lien for money actually borrowed. [Acts '34, p. 121, § 10.]

II. In requiring the postponed creditors to present their claims properly authenticated, on sixty days notice, but without fixing any time when the presentation shall commence or end; also, because the manner of authentication is not defined. [Gazzam v. Pontz, 4 Ala. Rep. 374; Ashurst v. Martin, 9 Porter, 574; Hyslop v. Clark, 14 John. 458; Wakeman v. Grover, 4 Paige, 23.]

III. Because complainants were existing creditors, known to the grantors, and trustees, and whose claims the deed has the tendency to delay. [Pope v. Wilson, 7 Ala. R. 695.]

IV. The residue, after paying the bonds, is reserved to the grantors, without porviding property for the payment of the complainant's demands.

V. The deed secures a preference to subsequent creditors, who may advance the corporation, money—the corporation being then insolvent, and debtors of the complainants. [Barham v. Hempstead, 7 Paige, 568.]

VI. The deed is invalid without the consent of the creditors, for whose benefit it was made, as all creditors by its terms are delayed until the 1st April, '42. Kemp v. Porter, 7 Ala. Rep. 138; Elmes v. Sutherland, Ib. 262; Hodge v. Wyatt, 10 Ala. Rep. 271.

VII. The deed was made in contemplation of immediate insolvency, and provides a trust for the grantors for two and a half years.

VIII. The deed was not recorded at the different places where the land is situate, or within the time required by law.

4. If the deed is not void on its face, the surrounding and attending circumstances show it was a contrivance to keep creditors at bay until the road could be finished, and the object was to place the corporation in a condition to work out its debts. If one will advance his money on a security calculated to produce such results, it is a fraud on the other creditors. [Cummings v. McCullough, 5 Ala. Rep. 335; Wiswall v. Ticknor, 6 Ib. 184.]

5. The mode of selling is another indication of fraud, or secret reservation of trust. [Nesbit v. Dallam, 7 G. & J. 494; Griff v. Jones, 6 Wend. 522.] And in fact the road is now owned by the same corporation under another name. [Acts of '46, p. 18.

6. The capital stock of a corporation is a pledge for the payment of debts. [An. & A. on Cor. 475; Wood v. Dammon, 2 Mason, 308; 5 No. Law Mag. 282; State v. Reeves, 5 Iredell, 297.]

7. The subscriptions of stockholders is liable, the same as the capital stock. [4 No. Law Mag. 106; Ward v. Gris-

wold do. January, '46; Selma R. R. Co. v. Tipton, 5 Ala. R. 757; Beenc v. Cahawba R. R. Co. 3 Ib. 660.]

8. Members cannot withdraw, and thus evade their liability. [Selma R. R. Co. v. Tipton, 5 Ala. R. 757.]

J. E. Belser and J. W. Pryor, for the defendants in error, insisted—

1. The facts set out in the amended and supplemental bills are immaterial in connection with the original bill, and made the proceedings considered as a whole, multifarious. [Story's Eq. Pl. 17, 593; Birch v. Scott, Bland. 121; Chapman v. Chim, 5 Ala. R. 402.]

2. The cause is in such a condition, that no decree can be pronounced on the general equities—therefore the demurrer should have been sustained, for though general, it opens the equity of the bill. [Crawford v. Childers, 1 Ala. R. 482.] The cases cited by the complainant do not come up to this, as in all of them the defendants were connected with the transaction by fraudulent acts.

3. If however, the cause should be retained and a decree made on its merits, it is insisted the individual corporators are not chargeable with the debts of the corporation. [1 Black. Comm. 517; 1 Fonbl. Eq. 306; 1 Lev. 237; 2 Verm. 396.]

4. It is not enough to confer equity jurisdiction, that no property can be found. There must be some ground for equitable interference, such as trust, fraud, &c. [Williams v. Hubbard, Walker, 29; Donovan v. Finn, Hop. 59; U. S. v. Myers, 2 Brock. 516.] The stock is the property of the corporation, and property is not a trust fund for creditors. [Catlin v. Eagle Bank, 6 Conn. 233; Pope v. Brandon, 2 Stew. 401]

5. If however, the property can be reached by creditors, on the notion of a trust, the bill should have averred there were no other creditors unpaid, and should have been filed for the benefit of creditors in general. [Ward v. G. Comp'y, 16 Conn. 594; 1 Bland. 84; 2 John. Ch. 306.]

6. It may be important to consider whether the rail road itself could be reached by execution. The road is in law a franchise which cannot be seized or sold; all that can be sub-

jected is the profits over what is necessary to keep the road in repair. [13 S. & R. 210; 4 Mass. 596; 2 Bac. Ab. Execution, C; Rives v. The State, 5 Iredell, 297.] In Pennsylvania they have the same statute making lands subject; yet the case cited shows a rail road cannot be sold under this general term. In North Carolina, where the decision was otherwise, it turned on a statute making the property of the corporation subject to *fi, fa.* [10 Am. Law Mag. 282; State v. Rives, 5 Iredell, 297.] The fact that the corporation sold the road, and that the legislature invested another company with the purchase, does not give the complainants any rights. The grant must be considered as a new grant. [See act of 1843.]

7. Although one section of the charter gives the power to the company to pledge its property for a loan, it cannot be considered as taking away the general power, or it may be considered as creating the power to pledge the franchise. [A. & A. on Corp. 126; Reynolds v. Com'rs, 5 Ohio, 205; Jackson v. Brown, 5 Wend. 590.]

8. A corporation has the same right as an individual to prefer one creditor to another, and the fact of insolvency will not avoid the deed. [Bank v. Bates, 6 G. & J. 315; Catlin v. Bank, 6 Conn. 233; Bank v. Bates, 8 Conn. 505; Conway, et al. v. — 5 Ark. 302; Pope v. Brandon, 2 Stew. 401.]

9. This deed does not show the corporation was in failing circumstances, or that it contemplated insolvency at that or any other time. On the contrary, the object was to raise funds to finish the road for a certain distance, and thus make it productive, without which no creditor could expect to be paid.

10. The deed in this case was not intended to secure future liabilities, as the action of the board contemplated an immediate loan of money, but if it was so intended, this is no matter to avoid the deed. [Hendricks v. Roberson, 2 John. Ch. 306; U. States v. Hooe, 3 Cranch, 73; Barnum v. Hempstead, 7 Paige, 568; Halsey v. Whitney, 4 Mason, 206; Johnson v. Cunningham, 1 Ala. Rep: 249; Stover v. Herrington, 7 Ib. 142; Carloss v. Ansley, June Term, 1846.]

11. Nor does the stipulation that the mortgagors shall remain in possession avoid the deed. [Brindley v. Spring, 7

Greenl. 241; Bassiter v. Wheeler, 9 Pick. 21; Foster v. Parker, 12 Ib. 451; Cunningham v. Freeborn, 11 Wend. 240; Vernon v. Martin, 8 Dana, 251; Tompkins v. Wheeler, 16 Peters, 119; Bank v. Clark, 7 Ala. Rep. 768; 6 Ala. 189; 7 Ala. Rep. 879.]

12. If it was necessary for this deed to be recorded within any precise period, the mere fact that it contains personal estate will not avoid it as to the realty. [Prince v. Roper, 9 Pick. 176; Anderson v. Hooks, Jan. Term, '46.] The question of recording, however, is not raised in the bill; if it had been, the fact of notice might have been in issue. [Clements v. Kellogg, 1 Ala. Rep. 330.]

GOLDTHWAITE, J.—1. When the objection of multifariousness is well taken to a bill, it is probably the correct practice to allow the party to amend, or elect on which ground of equity he will proceed. [Marriott v. Givens, 8 Ala. Rep. 694.] If it is so, however, it does not follow that a decree of dismissal will be reversed because the election is not tendered by the court, instead of being asked by the party. Neither does it seem to be a necessary consequence of the right which defendants have, to object specially on account of multifariousness. [Welborn v. Tiller, 10 Ala. Rep. 305.] That the court is prevented from refusing of its own mere motion to entertain jurisdiction of a suit which is thus complicated, see Greenwood v. Churchill, 1 M. & K. 546.] We do not intend, however, now to discuss any of these questions, as in our judgment the bill in the present case is not multifarious. The object of the bill is to reach the equitable assets of the corporation in satisfaction of the complainants' judgments at law. These assets, it seems, are supposed to be of two sorts—1. Those arising from the right of the corporation to call in its unpaid stock; and 2. Those which may be produced by setting aside the alledged illegal conveyance. Now it is true, the stockholders, as individuals, have no concern with the allegations of fraud which affect the deed; but, supposing the unpaid subscriptions and the property conveyed to be assets of the company, the creditor has the right to pursue them as such, and is entitled to the aid of a court of equity to remove the obstructions which

prevent him from doing so. In Brinkerhoff v. Brown, 6 John. Ch. 139, the object of the bill, as it is here, was to set aside conveyances as well as to compel payment from defaulting stockholders. It is true, the chancellor seems to rest his decision against the demurrer on the ground that all the defendants are charged with fraudulent practices, though in different degrees; but we do not think this is the foundation on which the right to join defendants rests. If it was, and the fraud was disproved at the hearing, there would be difficulty in saying the entire suit should not be dismissed. Again, if the right rested on such a charge, the complainant might always avoid the objection by making that sufficiently broad. It is said by Judge Story, after a careful review of all the adjudications, that the principles to be deduced from them seem to be, that when there is *a common liability in the defendants and a common interest in the plaintiffs*, different claims to property, at least if the subjects are such as can without inconvenience be joined, may be united in one and the same suit. [Eq. Plead. 409, § 533.] Lord Redesdale had previously said that when one general right is claimed against all the defendants, the court proceeds on the ground of preventing multiplicity of suits; and that if there are but few reported cases on the subject, it is because the practice is perfectly understood; and in bills by vicars, &c. claiming tithes against several defendants whose cases may be all distinct and their decrees different, the practice in England is constant. [Whally v. Dawson, 2 S. & Lef. 367.] The case of the Mayor of York v. Pilkington, 1 Atk. 282, is of this description; and there a bill was sustained to quiet the plaintiff's right to a fishery against several defendants having no privity between themselves. It will be seen the principle of this decision is quite different from that stated in Brinkerhoff v. Brown, and afterwards recognized in Fellows v. Fellows, 4 Cowen, 632, and extends the rule sufficiently far to cover this case. In creditors' bills, it seems in New York to be the common course to make the debtors of the defendant parties. [Stafford v. Mott, 3 Paige, 100.] Indeed, when we consider the correllative rule, that all judgment creditors may join as complainants, on the ground that there is a common right against the same defendants, it seems entirely reasonable that

Allen, et al. v. Montgomery R. R. Co. et al.

any creditor should have the right against as many defendants as may be necessary to give a full remedy, when all of these defendants are alike chargeable to him.   The analogy which there is between this case and a creditor's bill, in which the debtors of a judgment debtor are proper parties must be apparent to every one, although it is possible such debtors would not be proper parties to a similar bill in our own courts, unless on account of some additional equity, for the reason that our statutes allow such to be garnisheed by process from the courts of law.   Whether there are such additional equities here against the stockholders we shall presently consider, but what has already been said is sufficient to indicate our opinion that the bill should not have been dismissed on the grounds assumed by the chancellor.

2. We come now to consider what is the equity of the bill as against each class of the defendants.   As to those stockholders who were in default in paying their subscriptions after the calls of the corporation, (if indeed the bill shows there were any such) it is certain these could be reached by the ordinary course of law as debtors to the corporation.   [7 Ala. Rep. 51; 5 Ib. 403; Ib. 787.]   And therefore as against such, it may be considered the bill will not lie, as no additional equitable circumstances are stated to give jurisdiction to the court.

3. As to stockholders on whom no calls had been made under the charter, (which we understand is the case intended to be presented by the bill) a different rule obtains.   If the act of 1841 (Dig. 261, § 10) is to be construed as allowing garnishee process when the corporation itself has made no calls, it does not cover this case, for the bill was exhibited before that act was passed ; and it is certain they were not liable to that process under the previous legislation, for the indebtedness was incomplete until a call was made pursuant to the charter.   *See cases last cited.*   Has then a court of equity the authority to reach subscriptions for stock to satisfy a creditor when there is a deficiency of legal assets, in the absence of any call by the corporation upon its stockholders ? That it has, is, we think, a clear position, as well on principle as authority.   As the individual corporators are not them-

57

selves personally responsible for the contracts of the corpora-
tion, there is no responsibility any where, if the capital stock
is not a fund answerable to the creditors, and it would seem
to make no difference in the right, whether this capital stock
or fund existed in property or equitable assets. Nor can it
vary the right if the legislature, instead of requiring the stock
to be paid in, has permitted the corporation to call for it as
their necessities, or the convenience of stockholders may re-
quire. In the latter case, the subscription is a debt which
the corporation may call for, and if debts are contracted be-
yond the assets in hand, it would be most inequitable to ne-
glect or refuse to make the call so as to discharge the debt.
It is on this obvious principle that a court of equity assumes
jurisdiction and compels the corporation and stockholder to
do that which justice requires—that is, to discharge the debt
to the extent that the capital stock remains in the hands of
the stockholder. In Wood v. Dummer, 3 Mason, 308, indi-
vidual stockholders were held liable where the capital of the
corporation had been paid out to them even after its insol-
vency and dissolution. The equity of the creditor, as it
seems to us, is equally strong where the stockholder has con-
tracted to pay, but has never paid his portion of the capital
stock. Hence, we conclude the creditor has the right to
pursue a stockholder when there is a sufficiency of legal as-
sets, although the corporation has made no calls.

4. It becomes necessary to ascertain further, whether the
creditor has any rights against such stockholders as the com-
pany proceeded against, to forfeit their shares for non-pay-
ment of instalments, or against such as transferred their
shares previous to the exhibition of the bill. We consider
these positions together, because, ordinarily, they seem to be
governed by the same general principles, where there is no
special provision in the act of incorporation. In general, the
subscription by the stockholder makes him a contractor with
the corporation upon the terms prescribed by the act creating
it, (3 Ala. Rep. 660; 5 Ib. 787); and it seems a necessary
consequence that, where the rights of others are not affected,
the contract may be modified or discharged by mutual con-
sent. In the present instance, the act of incorporation ex-
pressly gives the corporation the power to forfeit the stock of

delinquent subscribers, and although this is a privilege conferred on the corporation, and which they may waive if they will, and resort to their other remedies to call in the stock subscribed for, (5 Ala. Rep. 787), yet we think it admits of no reasonable doubt when the election is made *bona fide* and the forfeiture insisted on, that there is an end of the contract.

5. The charter is silent as to the time and the mode and manner in which the stock may be transferred, yet we apprehend a stockholder at any time after subscription, could invest another with his rights in the company. That he can discharge himself from liability, either to the company or elsewhere by his own act, is by no means clear, and we incline strongly to the opinion, that it could not be done without the consent of the corporation. If, however, the corporation consents to discharge him from the contract and receive his transferee as a stockholder in his stead, we can perceive no valid objection to their doing so. Indeed, the whole matter seems to rest on the same principles as any other contract, where a different rule is not prescribed by or necessarily grows out of the charter. It can scarcely be supposed that equity would allow a debtor to voluntarily discharge his debtor to the prejudice of creditors; and it has been held a stockholder cannot avoid responsibility by a transfer to an insolvent person. [Marcy v. Clark, 17 Mass. 330.] It has also been held, that a fraudulent subscription in the name of minors would not avail the actual subscriber against the claims of a creditor. [Roman v. Fry, 5 J. J. M. 634.] If these positions are true, and we are satisfied they are so, it warrants the conclusion that a *bona fide* transfer, accepted and recognized by the corporation, will have the effect to discharge the original subscriber from future liability to the corporation or its creditors. The *bona fides* of the transfers asserted by the answers do not seem to be controverted by the complainants, and as they were made and accepted by the corporation previous to the exhibition of the complainants' bill, in our judgment the latter have no claim against them.

6. Having ascertained the equities of the complainants against the stockholders of the corporation, we shall direct our attention to the trust deed. If this was an assignment

for the benefit of creditors, it would scarcely admit of question that the preference given to the bonds would render the deed void, as creating a trust subject to the future nomination and appointment of the corporation. [Barnum v. Hampstead, 7 Paige, 568.] Such, however, is not the character of this deed, nor was that effect contemplated or intended, unless the bonds were actually disposed of and were not paid at maturity. The corporation do not stipulate that its creditors generally or specially shall have any rights whatever under this deed, if the bonds remain in the hands of the company.

If a sale of the property conveyed, was necessary to meet the bonds, it was probably considered by the corporation as equivalent to a dissolution, and therefore the provision became necessary and proper, that the trustees should distribute the surplus *pro rata*, to all the creditors. In point of law, the trust deed was entirely inoperative until the bonds were actually issued, as until then, there was no debt to be secured, and if the right of any of the complainants to seize the estate of the corporation was complete by judgment and execution, before the bonds came to the possession of a *bona fide* holder, the deed of trust would not operate against this right. In our judgment, the validity of a conveyance of this description, rests on precisely the same principles as obtain when deeds are made which provide for the security of future advances, or for future liabilities. In the case of the United States v. Hooe, 3 Cranch, 75, it is said with respect to the latter kind, to be frequent for a person who expects to become more indebted, to mortgage property to his creditor as a security for debts to be contracted, as well as for those which are already due, and that although such a deed may be used for improper purposes, yet such a provision is not positively inadmissible. The same doctrine is sustained by a numerous array of authorities in Barnum v. Robinson, 2 Johns. Ch. 283. It is obvious in every deed of this nature, that if the mortgagee, or *cestui que trust* could avail himself of its provisions, after another creditor had armed himself with a judgment or execution, it would be exceedingly dangerous, and courts would probably limit its effects to such debts or liabilities as were in existence at the time of the creation of the judgment or execution lien ; but when the

debt or liability is created at a time when the grantor is not incapacitated from making a new conveyance as a security, no such danger can be apprehended.   At such a time he could give a new security, and there is no reason why he should not provide, that one already given shall have the same effect.   It is also obvious, when a deed is executed as a security for a future debt, that it is inoperative as a conveyance until the debt is created, and is indeed only a conveyance to uses to be subsequently declared by the grantor.   The time when these bonds came to the hands of *bona fide* holders, is not set out distinctly in the answers, though we think the fair inference is, the defendants are to be understood as asserting they were issued before the complainant's obtained their judgments.   The proof is also indistinct, except as to such of them as were sold to meet the indebtedness to Rogers, Ketchum & Grosvenor, which was the 10th December, '39, but the inference is strong, that those sold for cash, were sold previous to that time.   This inference becomes much stronger, from the circumstance that a witness was examined, who, from his connection with the company, must have known when the bonds were sold, but whom the complainants did not require to explain the doubtful matter.   We think then, the defendants have sufficiently made out, that this deed was executed as a security for the bonds, and that these were in the hands of *bona fide* holders, at least to a sufficient amount to sustain the deed, previous to any lien acquired by the complainants.   In this aspect the deed stands as a security, given to secure debts payable at a future day, and although the possession of the grantor is stipulated for until that day, this circumstance has no tendency to hinder or delay creditors, as they could at any time after their judgments have compelled the trustees to close the trusts within the principles stated in Dubose v. Dubose, 7 Ala. Rep. 235, and Pope v. Wilson, Ib. 690.   In our judgment, the deed on its face is valid, and operative when connected with the fact, that the bonds, or any of them, were held *bona fide* previous to the time when the complainants obtained judgment.

7. It is as well here as elsewhere, to express our opinion, that the circumstances of the case do not create the presumption of fraud in fact.   It may be, and doubtless is true, the cor-

poration was unable to meet its engagements—that it was in point of fact insolvent—but this did not take away its capacity to prefer either its old creditors or to give a valid security to new ones. It appears the effort was to get a portion of the road in working order, and *prima facie* expenditures for this purpose could have no bad effect on the rights of existing creditors. It appears also, that the entire sum received for the bonds was appropriated to the completion of the road, and that those which were issued on other contracts, were in payment for machinery, or to engineers, for a similar purpose. We are not warranted in declaring, either that the corporation, or its new creditors, acted with bad faith, or that the intention existed in either, to hinder or delay other creditors. The previous decisions of this court last referred to, are conclusive to show, that the deed itself was no impediment in the way of other creditors seeking to close the trust, and that the courts would have enforced their rights to the residuum, which was all they were entitled to.

8. The two last conclusions dispose of many of the positions assumed by the complainants, but there yet remain others which require an answer. It is urged, the directors have no power by the charter to mortgage or charge the property of the company, except for money borrowed, and consequently that the present sale will be set aside because bonds were issued for debts created in a different way. It is true, that by a special section of the charter, the president and directors are empowered "to borrow money to carry into effect the objects of the charter, to issue certificates or other evidence of such loans, and to pledge the *property* of the company for the payment of such loans." We do not think it important to inquire whether this section authorizes a pledge of the franchise, in common with the other property of the company, because, if it does not, there is nothing to induce the supposition that the legislature intended to take away the general power of the corporation to create liens for any other purpose. In our judgment, the general powers of the corporation extended to the creation of a lien on all its property, without reference to the mode of creating the debt, and it is not unlikely the section referred to was intended to confer the power to hypothecate the franchise also.

9. Another point in the case is, that the mortgage is void because it was not recorded in proper time. If the object was, to set aside the deed on this ground, we think it should have been set out in the bill, in order that the defendants might reply the fact of notice, as it only is to creditors without notice that the statute avoids an unrecorded deed of trust. [Dig. 256, § 5.]

10. The allegation that the sale was made for an inadequate price, does not seem sustained by the testimony, but if it was, a grave question would arise, whether any court would feel authorized to act on such grounds, when the parties complaining of it do not come at the arliest period, and even then, whether the biddings will be opened without the offer to bid a greater sum. The same remarks, in a great degree, apply to the objection that the sale was in gross. There is no evidence of fraud in the sale, or that the property would have commanded a greater sum if sold in separate lots.

11. We shall purposely omit to consider the act incorporating the Montgomery and West Point Rail Road Company or rather changing to that the name of the former corporation, because the facts involved in this case seem to have no connection with that act. The circumstance that the purchasers under the trust deed have thought proper to surrender their purchase to the new or changed corporation is not a fact charged in the bill, nor does it by itself make out the charge that the property was purchased for that or for the old corporation.

The conclusion affecting this cause, to be drawn from the principles thus ascertained, is, that the bills were improperly dismissed on the ground of multifariousness—that at the hearing, the original bill should have been retained, and an account taken of what was due from the stockholders, in conformity with the rules now declared, and that the amended and supplemental bills, so far as these seek to charge the trustees, the purchasers under them, and the Montgomery and West Point Rail Road Company, should be dismissed.

Decree reversed and remanded, for proceedings in conformity with this opinion.