No. 5519.

### STATE OF LOUISIANA vs. CHARLES MORGAN.*

All legislative contracts must be construed most favorably to the State, if there is any doubt as to their meaning or interpretation, and a party claiming exemption from taxation must come strictly within the provisions of the statute granting it.

Considering the provisions of sections two, three, and eleven of the charter, the conclusion is that the exemption from taxation granted to the New Orleans, Opelousas, and Great Western Railroad was not a transferable right; that the State never intended to confer on the grantee the power to convey this right or privilege to another corporation or to a natural person. The privileges granted were to the person of the grantee. It was never intended to attach to the property of the corporation, and to follow it into third hand when sold on execution.

The franchises of a railroad company can not be alienated without the consent of the State which granted them. When the State covenants and agrees that a certain corporation shall administer certain franchises, the ordinary judgment creditors of that corporation may seize and sell its property, but not the franchises. It is a State prerogative to put the administration of its franchises into such hands as it may choose, and they can not be transferred without the consent of the State.

Therefore the sale of 1870 by the ordinary judgment creditors of the New Orleans, Opelousas, and Great Western Railroad Company to the plaintiff, Charles Morgan, who had previously bought the first division of the road extending from Algiers to Berwick's Bay, of the unfinished division of the same extending from Berwick's Bay to Opelousas, and the division from Opelousas to the Sabine, upon which no work had ever been done, transferred to the purchaser whatever property the corporation had embraced within those divisions; but not the person of the corporation and the franchises which the State had committed to its hands were not alienated.

State vs. Morgan.

Section nine of the charter of 1853 authorized the corporation to borrow money as might be required for certain purposes and to mortgage the property of the company to accomplish that object, but no authority was given to mortgage the franchises.

In 1856 the State passed a general act authorizing railroad companies to mortgage their property and franchises. Until this act was passed the franchises of a railroad company in this State could not be mortgaged. Otherwise, that act would have been unnecessary.

Charles Morgan did not acquire the privilege of exemption from taxation by virtue of the adjudication to him of the first great division of the railroad which was granted by the charter to the capital stock and other property of said corporation. The obligation underlying this right of exemption from taxation was an indivisible obligation, and the obligation underlying the right of exemption of the officers and employees of said corporation from jury duty and military duty was also an indivisible obligation. Neither of these can be broken up at the option of the incorporators and divided into as many obligations and rights as they may desire.

The right of corporate existence can not be divided up and made applicable to the different divisions of a railroad. Nor can the right to expropriate property be parceled out among the purchasers of the various divisions of a railroad.

Several corporations, possessing the rights and franchises stated, can not spring into existence by the act of a railroad company in mortgaging and selling separate divisions of their road with the rights and franchises applicable to each division, because this would be the exercise of a prerogative by a creature that belongs exclusively to its creator.

Hence the plaintiff did not, by the adjudication under the foreclosure of the mortgage on the first division of the road with the rights and privileges applicable to it, acquire the privilege of exemption from taxation, assuming that such privilege was acquirable under a mortgage and adjudication of all the franchises and property of the New Orleans, Opelousas, and Great Western Railroad Company, pursuant to the act of 1856.

But, assuming that by the purchase of all the shares of stock or otherwise the plaintiff stands before the court representing the New Orleans, Opelousas, and Great Western Railroad Company, he can not claim the exemption from taxation mentioned in the charter, in view of the fact that the railroad has not been completed within the limits of the State, although more than twenty years have elapsed since the charter was granted.

The charge that the State, in assessing the taxes now sought to be collected, has violated the obligation of her contract with the New Orleans, Opelousas, and Great Western Railroad Company can not be maintained. The State never agreed to exempt from taxation forever the property of that corporation.

The stipulation in the charter was that the capital stock and other property of said company "shall be exempt from taxation for ten years after the completion of said road within the limits of this State." The consideration of this grant was, of course, the promise of the corporation to prosecute to completion the building of the railroad. Over twenty years have passed, and nothing of the kind has been done, and there is no visible prospect of its completion.

In the face of such a palpable abandonment of the enterprise and such a flagrant breach of contract, it is with bad grace that the defendant, when taxed on the property described in this suit, complains that the State is impairing its obligations. To permit the corporation by its own derelictions to prolong the period of exemption from taxation would be to allow it to take advantage of its own wrong; and what the corporation can not do the defendant claiming under it can not accomplish.

APPEAL from the Superior District Court, parish of Orleans. *Hawkins*, J.  *Henry C. Dibble*, Assistant Attorney General, and *W. R. Mills*, for plaintiff and appellee.  *Leory & Monroe*, for defendant and appellant.

WYLY, J.  This is a controversy between the State and Charles Morgan in regard to the collection of taxes assessed against him on certain real estate, rolling stock, and ferryboats described in the suit.  The defense is:

First—This property is not liable to taxation, because it was acquired by Charles Morgan from the New Orleans, Opelousas, and Great Western Railroad Company, and by the second section of the charter of said corporation all its property was exempted from taxation.

Second—The assessment of the property was excessive.

As the record does not present a case entitling defendant to relief on the second ground, we will turn to the first, which presents the important question in this litigation.

Before entering upon the discussion, however, it will be necessary to notice some of the provisions of the charter of the New Orleans, Opelousas, and Great Western Railroad Company, and to state some of the facts disclosed by the record.

By act No. 149 of the acts of 1853 the General Assembly incorporated the New Orleans, Opelousas, and Great Western Railroad Company "for the purpose of constructing, working, and maintaining a railroad from Algiers, on the opposite side of the Mississippi river from New Orleans, and thence westward to Bayou Lafourche, thence to Berwick's Bay, thence to Washington, or near it, on the Courtableau, in the parish of St. Landry, and from thence hereafter to be continued to the point on the Sabine river most favorable for the purpose of continuing said road through the State of Texas to El Paso, on the Rio Grande."

Section one creates said railroad company into a body corporate and politic with "full power to sue and be sued, plead and be impleaded, to do and perform all other acts, and enjoy all the rights and privileges incident to corporations."

Section two provides that " the capital stock of said company shall be exempt from taxation, and its works, fixtures, workshops, warehouses, vehicles of transportation, and other appurtenances, shall be exempt from taxation for ten years after the completion of said road within the limits of this State."

Section three provides that "the president, engineers, clerks, agents, and servants of said company shall be exempt from jury duty and from military duty, except in case of invasion or insurrection."

Section five fixes the capital stock of said company at six millions of dollars, divided into two hundred and forty thousand shares.

Section nine provides that " the president and directors of said New Orleans, Opelousas, and Great Western Railroad Company may borrow, from time to time, such sums of money as may be required for the construction of said road, over and above the amount received from sub-

scriptions to its capital stock, provided the amounts borrowed do not exceed six millions of dollars ; and said president and directors be and are hereby authorized to secure said loans by mortgaging the property of the company, in whole or in part, as they may deem expedient ; and any mortgage so given need not be reinscribed to continue said mortgage in force."

Section eleven provides that " said New Orleans, Opelousas, and Great Western Railroad Company shall have perpetual existence, unless said corporation is dissolved by a vote of three fourths of its stockholders at a meeting called specially for the purpose, or unless said corporation shall fail or be insolvent ;"     *     *     *     *     *     *     *     *

These are the only sections of this statute that need be noticed.

In 1856 the General Assembly passed a general law, being act No. 194, entitled " An Act to extend the Powers of Railroad Companies."

Section one provides that " in addition to the powers conferred by law upon railroad companies, any railroad company established under the laws of this State may borrow, from time to time, such sums of money as may be required for the construction or repairs of any railroad, and for this purpose may issue bonds or their obligations, secured by mortgage upon the franchises and all the property of said companies, and payable at such times and places as the president and directors may designate, with power to sell. pledge, or otherwise dispose of said bonds on such terms as the president and directors may deem expedient."

Early in 1857 the first division of the New Orleans, Opelousas, and Great Western Railroad was completed to Berwick's Bay, a distance of eighty miles.

For the purpose of obtaining means for the further completion of the road, in March, 1859, the board of directors of said company passed resolutions authorizing the president to issue two thousand bonds of the New Orleans, Opelousas, and Great Western Railroad Company for one thousand dollars each; and to secure the payment of said bonds and the interest thereon by a first mortgage on the first grand division of the railroad, from Algiers to Berwick's Bay, " *together with the land over which said road is constructed, the equipments, appurtenances, rights, and franchises of the company applicable to this portion of the road.*"

Under this authority and the power conferred by the statutes quoted, the president in April, 1859, issued the bonds and executed the mortgage on the first division of the road, extending from Algiers to Berwick's Bay.

With the funds arising from this source the company continued the work and almost completed the entire grading to Opelousas, a distance of eighty-five miles beyond Berwick's Bay, when, in 1862, further operations were discontinued on said road on account of the war, the road having been seized by the military forces of the United States.

When the road was restored to the company, in 1866, it made every possible effort to resume work and to complete the road, but without success. No work has since been done by the company.

The result of its labors was the completion of the first division of the road, a distance of eighty miles, and the clearing and partial grading of the second division, extending from Berwick's Bay to Opelousas, a distance of eighty-five miles. The third division, from Opelousas to the Sabine, a distance of ninety-eight miles, remains untouched.

In 1869 Charles Morgan, the holder of certain of the mortgage bonds, foreclosed the mortgage on the first division, and purchased it under executory process issued by the United States Circuit Court. In 1870 he purchased, under ordinary writs of *fieri facias*, issued in certain judgments against said company in the district courts of the parish of Orleans, all and singular the balance of the property of the New Orleans, Opelousas, and Great Western Railroad Company. Subsequently, to wit: on the twelfth of December, 1871, Charles Morgan conveyed to the New Orleans, Mobile, and Texas Railroad Company "the franchises, rights, and privileges now owned by said Charles Morgan for the construction and maintenance of a line of railroad running from Brashear City northwestwardly so as to connect with the main line of railroad of the New Orleans, Mobile, and Texas Railroad at or near Vermilionville, and thence northwestwardly to the Red river, together with all the lands and rights of way for or in respect to such railroad from Brashear City northwestwardly to such point of connection at or near Vermilionville, and likewise for a railroad north of that point to Red river, which the said Charles Morgan now owns or is entitled to, and the benefit of all work heretofore done and improvements heretofore made upon the same in the shape of grading or otherwise." *    *    *    *    *    *

Subsequent to this conveyance the New Orleans, Mobile, and Texas Railroad Company expended from eighty to one hundred thousand dollars on the road from Brashear City to Vermilionville, and in August, 1872, suspended all further operations on said road.

Charles Morgan, since his purchase, has expended large sums in improving the first division from Algiers to Berwick's Bay, but no work has been done by him on the road beyond. This statement of facts and quotation from the statutes applicable to this case bring us to the consideration of the following questions:

First—Was the exemption from taxation stated in the second section of the charter of said company transferable?

Second—If so, was it conveyed to Charles Morgan by the purchase which he made of the railroad?

Third—If so, is he entitled to claim said exemption from taxation, in view of the fact that said railroad has not been completed within the

limits of the State, although more than twenty years have elapsed since the charter was granted ?

First—All legislative contracts must be construed most favorably to the State, if there is any doubt as to their meaning or interpretation. And a party claiming exemption from taxation must come strictly within the provisions of the statute granting it. 1 Black. 436; 8 Wallace, 431.

. Considering the provisions of sections two, three, and eleven of the charter, we are of opinion that the exemption from taxation granted to the New Orleans, Opelousas, and Great Western Railroad was not a transferable right ; that the State never intended to confer on the grantee the power to convey this right or privilege to another corporation or to a natural person. Mark the language of the statute, which declares, not that certain property shall be forever exempt from taxation, but that "the capital stock of said company shall be exempt from taxation, and its works, fixtures, workshops, warehouses, vehicles of transportation, and other appurtenances shall be exempt from taxation for ten years after the completion of said road within the limits of this State."

Also, consider the phraseology of section three, which declares that " the president, engineers, clerks, agents, and servants of said company shall be exempt from jury duty and from military duty, except in case of invasion or insurrection."

Can this right of exemption for a limited time from taxation, conferred in precise terms upon a certain railroad corporation, and this right of exemption from jury and military duty conferred upon the " president, clerks, agents, and servants of said company," be extended, by any fair construction of the statute, so as to authorize and empower the grantee to transfer these rights or privileges to another corporation or to *a natural person?* We think not. The consideration to the State was the stipulation or engagement of the company to build the railroad to the Texas line. For this, in addition to other privileges granted, the State agreed to exempt the capital stock and other property of said corporation from taxation for ten years after the completion of the work, and also to exempt from jury and military duty the officers, agents, and servants of said company. The grant of these privileges was to the person of the grantee. It was never intended to attach to the property of the corporation and to follow it into third hands when sold on execution.

The case of New Jersey vs. Melier, 7 Cranch. 499, cited by the defend-ant, was not like the one now before the court. There the land pur-chased by the State for the Indians was exempted by a legislative act from taxation, and the court maintained the exemption of such land in third hands, on the ground that the land had been sold with the assent of the State with all its privileges and immunities, and that the "privilege,

though for the benefit of the Indians, is annexed, by the terms of the act which created it to the land itself, not to their person."

The case of the Home of the Friendless vs. Rouse, 8 Wal. 431, closely resembles the one now under consideration so far as the point in discussion is concerned. There was a statute which gave to a charitable institution a charter, and declared by it that the property of said corporation shall be exempt from taxation, and the court. held that as soon as the corporation was organized the contract became completed, "and its property is not subject to taxation so long as the corporation owns it and applies it to the purpose for which the charter was granted." Here, to encourage the New Orleans, Opelousas, and Great Western Railroad Company to build the road to the Sabine, or the Texas line, the State, in precise terms, agreed to exempt its capital stock and other property from taxation for ten years after the completion of said road; but during this period it was manifestly the intention that the exemption should apply only to the property owned by said corporation.

Second—But, assuming the transferability of the right or privilege in question, the inquiry is, was it conveyed to Charles Morgan by the purchase which he made of the railroad ?

However difficult it may be to form a satisfactory opinion as to the extent of the franchises of a railroad company that are liable to pass to a purchaser under the foreclosure of a mortgage authorized by legislative enactment, on account of the conflicting adjudications of the courts in different States, we find no difficulty in arriving at the conclusion that the franchises of a railroad corporation can not be alienated without the consent of the State which granted them. As all franchises belong exclusively to the State, no one will be permitted to possess and administer any of them without the consent of the State.

When the State covenants and agrees that a certain corporation shall administer certain franchises, the ordinary judgment creditors of that corporation may seize and sell its property, but not the franchises. They are beyond the reach of an ordinary execution. It is a State prerogative to put the administration of its franchises into such hands as it may choose. And they can not be transferred to other hands without the consent of the State.

When, in 1853, the State gave to the New Orleans, Opelousas, and Great Western Railroad Company corporate existence and the franchises necessary to construct and operate a railroad from Algiers to the Sabine, together with a limited exemption from taxation of its capital stock and other property, the State did not consent that these franchises should be transferred to third hands by a sale on execution by the ordinary judgment creditors of said corporation. Therefore the sale of 1870 by the ordinary judgment creditors of said corporation to Charles Morgan of

the unfinished division of the New Orleans, Opelousas, and Great Western Railroad extending from Berwick's Bay to Opelousas, and the division of ninety-eight miles from Opelousas to the Sabine (upon which no work had ever been done), transferred to the purchaser whatever property the corporation had embraced within those divisions, but the person of the corporation and the franchises which the State had committed to its hands were not alienated.

The fact that he had previously bought the first division under the foreclosure of the mortgage which the corporation was authorized to give, gave to Charles Morgan no greater rights under the adjudication of the ordinary executions than any other purchaser would have acquired.

Section nine of the charter of 1853 authorized the corporation to borrow money, from time to time, as might be required for the construction of said road, and "to secure said loans by mortgaging the property of the company, in whole or in part, as they shall deem expedient," but no authority was given to mortgage the franchises of said corporation. The State, however, in 1856 passed a general law declaring that "any railroad company established under the laws of this State may borrow, from time to time, such sums of money as may be required for the construction or repairs of any railroad, and for this purpose may issue bonds, or their obligations, secured by mortgage upon the franchises and property of said company." * * * Until the act of 1856 the franchises of a railroad corporation in this State could not be mortgaged; otherwise that act would have been unnecessary.

Assuming, for the purpose of argument, that the privilege of exemption from taxation conferred on the New Orleans, Opelousas, and Great Western Railroad Company was transferable under the foreclosure of a mortgage of all its franchises and all its property, pursuant to the provisions of the act of 1856, the question is, did Charles Morgan acquire this privilege by virtue of the adjudication to him in 1869 of the first grand division of the railroad under the foreclosure of the mortgage? Did he, by that adjudication, succeed to all the franchises and property of said corporation? He did not. He only acquired what was embraced in the mortgage, to wit: the first grand division of the railroad, from Algiers to Berwick's Bay, "together with the land over which said road is constructed, the equipments, appurtenances, rights, and franchises of the company applicable to this portion of the road."

Taking the construction most favorable to the State, as we will do in all contracts of this kind, the conclusion is inevitable that the mortgage and alienation of the rights and franchises applicable to this division of the road did not embrace the exemption from taxation which was granted by the charter to the capital stock and other property of said corporation.

38

. The obligation underlying this right of exemption from taxation was an indivisible obligation. And the obligation underlying the right of exemption of the officers and employees of said corporation from jury duty and from military duty was also an indivisible obligation. Neither of these can be broken up at the option of the incorporators and divided into as many obligations and rights as they may desire.

The right of corporate existence can not be divided up and made applicable to the different divisions of a railroad. Nor can the right to expropriate property be parceled out among the purchasers of the various divisions of a railroad. Several corporations possessing the rights and franchises stated can not spring into existence by the act of a railroad company in mortgaging and selling separate divisions of their road, with the rights and franchises applicable to each division; because this would be the exercise of a prerogative by a creature that belongs exclusively to its creator.

Our conclusion is that Charles Morgan did not, by the adjudication under the foreclosure of the mortgage on the first division of the road with the rights and privileges applicable to it, acquire the privilege of exemption from taxation, assuming that such privilege was acquirable under a mortgage and adjudication of all the franchises and property of the New Orleans, Opelousas, and Great Western Railroad Company, pursuant to the act of 1856.

Third—But, for the purpose of argument, let us assume that Chas. Morgan, by the adjudication stated, succeeded to all the rights and franchises of the corporation, including the right of corporate existence and the privilege of exemption from taxation stated in the charter. In other words, let us assume that by the purchase of all the shares of stock, or otherwise, Charles Morgan stood before the court representing the New Orleans, Opelousas, and Great Western Railroad Company, and the question was, whether said corporation was entitled to claim the exemption from taxation mentioned in the charter, in view of the fact that the railroad has not been completed within the limits of the State, although more than twenty years have passed since the charter was granted, and our conclusion would be, from the evidence in the record, that the right of exemption could not be successfully maintained.

The charge that the State, in assessing the taxes now sought to be collected, has violated the obligation of her contract with the New Orleans, Opelousas, and Great Western Railroad Company, can not be maintained when the second section of the charter is read in the light of the facts disclosed in the record.

The State never agreed to exempt from taxation forever the property of that corporation.

The stipulation in the charter was, that the capital stock and other

property of said company "*shall be exempt from taxation for ten years after the completion of said road within the limits of this State.*" The consideration of the grant of this privilege was, of course, the promise of the corporation to prosecute to completion the work of building the railroad to the Sabine, or the Texas line. No time was fixed for the completion of the work; but the understanding doubtless was that it should be completed within the time usually occupied in accomplishing such enterprises.

Now, what has the corporation done toward the completion of the road, and what is the prospect of its completion? Eighty miles were promptly completed, eighty-five miles beyond that have been partially graded, and ninety-eight miles of the road remain untouched. This is all that has been accomplished since the charter was granted, in 1853, a period of over twenty years. Besides, there is no prospect of the completion of the road, no work having been done under the charter beyond Berwick's Bay since 1862, a period of over ten years. Over twenty years have elapsed, and the road has not been half completed. Over ten years have passed, and not a rod has been graded or a rail laid or a bridge built, or any work whatever done on the unfinished divisions of the road by the corporation or by Charles Morgan.

In the face of such a palpable abandonment of the enterprise, and such a flagrant breach of contract, it is with bad grace that the charge is made by the defendant that the State, in making the assessment and demanding the taxes on the property described in this suit, is impairing the obligation of her contract.

By whose fault is it that after a period of over twenty years the road has not been half completed? By whose neglect is it that for over ten years no work has been done toward completing the unfinished divisions of the road?

To permit the corporation, by its own derelictions, to prolong the period of exemption from taxation as fixed by the charter, for ten years after the completion of the work, to an indefinite period (for there is now no prospect of a completion of the road) would be to allow it to take advantage of its own wrong. And what the corporation can not do, the defendant, claiming under it, can not accomplish.

How can he claim the exemption from taxation for the property he acquired when it was conditioned upon the completion of the road, and that enterprise has been abandoned for years? Will a party who has wholly failed to give or perform the consideration of a contract be permitted to hold the opposite party to the obligation contracted as the equivalent for such consideration?

Between ordinary litigants a void contract, or a contract the consideration of which has wholly failed, can not successfully be opposed to the

enforcement of a legal right. The State certainly has in its own courts the right which it accords to every litigant, and it can certainly show the invalidity of a contract set up to defeat the right which it asserts to its revenues. If the principle contended for by the defendant be true, and no taxes can be collected on the property comprised within the first division of the road, because the other divisions have not been completed, when will the State ever be able to derive any revenue from the property in question? By this theory, in order to make a limited exemption from taxation a perpetual one all that is necessary is to let the unfinished divisions remain unfinished and the desired result will be accomplished. Such a proposition can not be maintained. The corporation contracting with the State when the charter was made and accepted can not, by its own laches or its own derelictions, make the obligation of the State more onerous; it can not make a conditional and limited grant of immunity from taxation an absolute and perpetual one.

It is therefore ordered that the judgment herein in favor of plaintiff be affirmed with costs.

HOWELL, J., *concurring.*   I concur in the conclusion and decree in this case.

LUDELING, C. J., *dissenting.*   This suit is to collect taxes, alleged to be due by the defendant on account of his Louisiana and Texas Railroad. The defendant claims that the capital stock and all property attached to the railway is exempt from all taxation.

The New Orleans, Opelousas, and Great Western Railroad Company was chartered by act of the Legislature in April, 1853.

The second section of the charter declares that "the capital stock of said company shall be exempt from taxation, and its works, fixtures, workshops; warehouses, vehicles of transportation, and *other appurtenances* shall be exempt from taxation for ten years after the completion of said road within the limits of this State." And act No. 194 of the General Assembly of 1856 provides that "*in addition* to the powers conferred by law upon railroad companies, any railroad company established under the laws of this State may borrow, from time to time, such sums of money as may be required for the construction or repairs of any railroad, and for this purpose may issue bonds or their obligations, secured by mortgage *upon the franchises* and all the property of said companies," etc.   Acts of 1856.

Section nine of the charter of the company also authorized the company to borrow money on bonds, and "to secure said bonds by mortgaging the property of the company, in whole or in part, as they shall deem proper."   Acts of 1853, p. 121.

State vs. Morgan.

Under these statutes the company executed two thousand bonds of one thousand dollars each and secured their payment by mortgaging the completed grand division of the road, extending from New Orleans to Brashear, including depots, lands, equipments, *franchises*, etc.

After the war this mortgage was foreclosed, and Charles Morgan bought the railroad with its franchises from New Orleans to Brashear, that is, the property covered by the mortgage. Subsequently, he purchased the other portions of the road to the State line, which was partially graded, with the *franchises*, etc. Thus he became the owner of the entire road, with all the rights and franchises of the original company.

I am at a loss to imagine why the property is not exempt from taxation. The Legislature had unquestionably the power to exempt the property from taxation, and it did exempt it, and it authorized the franchises to be mortgaged and sold. Morgan acquired at public sale all the property and franchises of the company. Is not the exemption from taxation a *franchise* property? At this day this is not an open question in this country. 7 Cranch. 165; 1 Black. 536; 8 Wall. 437; 13 Wall. 264, 269; 16 Wall. 244; 18 Wall. 392; 20 Wall. 36; 21 Wall. 492; 11 Ala. 437; 28 Ala. 321; 4 Met. 200; 30 Vermont 182; 70 Penn. 355; 17 Conn. 40; Redfield on Railway, 477, 480.

By the textual provisions of the Code, not only corporeal objects may be sold, " but also *incorporeal things*, such as a debt, an inheritance, a servitude, *or any other rights.*" C. C. 2449.

Franchises, therefore, are incorporeal hereditaments, known as a species of property, as well as any estate in lands. Bouvier says: "A franchise is a certain privilege conferred by grant from the government." Worcester defines it to be " a certain privilege or exemption bestowed by grant from the government and vested in individuals—immunity."

Had the franchise been forfeited? I think not. There is no limit to the grant, except that it should cease to exist after *ten years after the* completion of the road to the State line. The road is not yet completed. It is said, however, that the defendant is not trying to complete the road. Be that as it may, no steps have as yet been taken to forfeit the grant, and, in my opinion, it can not be done in this suit.

I therefore dissent from the opinion of the majority of my associate justices.

Rehearing refused.

*Carried by writ of error to the Supreme Court of the United States.