# MOBILE AND CEDAR POINT R. R. CO. v. TALMAN AND RALSTONS.

1. Where two mortgagees, one of whom has a mortgage on a part only, and the other on the whole, of the property named in the bill, join as complainants, the bill is not multifarious.

2. The objection of multifariousness, cannot be made for the first time in this court.

3. Where a bill, after alledging, that the M. and C. P. R. R. Co. was indebted to the A. L. Ins. and Tr. Co., and that the former executed to the latter, a note and mortgage, to secure the payment of said indebtedness, avers, that the complainant "is the assignee of the said A. L. Ins. and Tr. Co. of the said indenture of mortgage, and the said promissory note, and entitled to all their rights and remedies, therein and thereupon," &c., this is a sufficient averment of title in the complainant.

4. Where one of several trustees, who have been made defendants to a bill, dies, and another person, *by consent in court*, is substituted in his stead, the irregularity, if there be any, is waived; and if said substituted party appears by attorney, and fails to answer, a decree *pro confesso* may be taken against him, notwithstanding he may not have been served with process.

5. Where an assignment, made by a debtor of all his estate, to trustees and their successors, for the benefit of creditors, reserves to the assignor the right to substitute a trustee, in the event of the death, or refusal to act, of those appointed, and contemplates the exclusive management by the trustees of the interests conveyed, and one of the trustees, being also a *cestui que trust*, dies, pending a suit against the trustees, it is not necessary to revive the suit against the personal representative of the deceased trustee.

6. A corporation is capable of making every species of deed, and, though by special permission in its charter, it is empowered to mortgage its effects for a *particular* purpose, this will not take away, or abridge, its *general* power to execute mortgages for the benefit of creditors.

7. J. B. M., being fully authorized in that behalf by the M. and C. P. R. R. Co., and A. and G. R., enter into a written agreement, by which A. and G. R. engage to act as the agents of said company, and to purchase in England, pay for, insure, and ship to said company, at Mobile, a certain quantity of rail road iron, &c.: and the said company, in consideration thereof, undertake to pay the said A. and G. R. for the same, on its arrival at Mobile, &c., and to secure said payment, "pledges the real and personal estate of said company," to the said A. and G. R. Held—1. That the agreement constitutes an equitable mortgage in favor of A. and G. R. on all the real and personal estate of said company, which a court of chan-

M. and C. P. R. R. Co. v. Talman and Ralstons.

cery will enforce against said company, and all persons claiming under it with notice. 2. That neither the fact, that the agreement pledges the real and personal estate of said company, without specification, nor that the amount to be secured is not stated, nor that it is made to secure future advances, nor that no time of redemption is fixed, can, *per se*, render the agreement invalid.

8. Where an agreement is entered into between A. and G. R., and the M. and C. P. R. R. Co., by which A. and G. R. engage to purchase, pay for, insure, and ship to said company at Mobile, a certain quantity of rail road iron, &c. as a condition precedent to the liability of said company, in a bill filed by said A. and G. R. against the said company, to enforce said agreement, it is averred, "that there is now due to them from the company, the sum of $7,000, and upwards, accruing to them under the contract, and that they proceeded to purchase the iron, and furnished it to the company, according to the stipulations of the contract, having advanced the money therefor," this is a sufficient averment of performance.

9. Where a bill filed by T., and A. and G. R., against the M. and C. P. R. R. Co. and *others*, to foreclose a mortgage executed by said Co. to T. on a certain lot of land, and an equitable mortgage, executed by said Co. in Philadelphia, to A. and G. R., on "the real and personal estate" of said company, to secure debts due by it to T., and A. and G. R., respectively, after describing three parcels of land owned by said company at the time of the execution of said equitable mortgage, avers, "that the company was also possessed of large quantities of iron of various descriptions, steam engines, cars, and various other chattels, which were pledged by said contract," to A. and G. R: "that M. D. E. had converted the said chattels, or a large portion of them, to his own use, by selling the same, and receiving the proceeds thereof:" and the register, under a reference by the chancellor, reports a certain sum due to T. on the 1st January, 1847, and another sum due to A. and G. R., on the 31st December, 1843, subject to two credits of subsequent dates, and that these sums must draw interest to the 10th April, 1847, the time of the report: and the chancellor thereupon orders and decrees, that the "defendants" pay the amounts so reported, into the hands of the register, by the first day of May next thereafter, and on their failure to do so, the register shall proceed "to sell the property described in complainants' bill, and mortgages and exhibits, or so much thereof as shall be necessary to satisfy the complainants' debts, and interest, and costs of suit," &c. The decree is erroneous—1. Because it is incomplete. 2. For want of certainty.

10. If two mortgagees of the same property, file a bill to foreclose, a subsequent assignee of the property has no right to object that the senior mortgagee yields his priority of lien to the junior mortgagee.

11. Are not the stockholders in a corporation, which has by its regularly authorized agents created a lien on its effects in favor of a third person, estopped from asserting a lien created by said corporation in their favor? *quære.*

Error to the Court of Chancery of the 1st District. Before the Hon. A. Crenshaw, Chancellor.

This was a bill filed by the defendants in error, against the plaintiffs in error. The facts, &c. are so fully set out in the opinion of the court, that it is unnecessary to state them here. The chancellor decreed in favor of defendants in error.

Strwart, for plaintiffs in error.

1. The bill is multifarious. Two mortgages are joined in one bill. They are made to distinct parties, at different times, one embraces property which is not in the other—to litigate one, parties are necessary, which are not as to the other, and one of the complainants has no interest in a part of the property in litigation, and is joined with one who has. 6 Paige, 28; 5 Ib. 65; 3 Ib. 336; 1 Daniel's Pr. 383-4, 347; Story's Eq. Pl. 509, 551, 554. The court may, *sua sponte,* dismiss the bill for multifariousness. The deficiency of the bill was brought to the notice of the court below, and the court should have refused its decree on it. Story's Eq. Pl. § 284; 10 Ohio Rep. 456; 1 Daniel's Eq. Pr. 397.

2. The averments in the bill are too loose, vague and indefinite. The facts are not averred with sufficient precision, to show that the complainants have a right to a decree. A complainant must show his right clearly. 1 Daniel's Ch. Pr. 360. The averments must be positive. Ib. 411. Every thing intended to be proved, must be averred in the bill. Ib. 377. Certainty is required. Ib. 421-2. And every requisite fact must be shown, which is necessary to complete the complainant's title. 1 Story's Eq. Pl. § 257, 258; 1 Dan. Pr. 369. To show the right of Talman as assignee, the fact of the assignment must be averred, and it must be shown how it was assigned, so that the court may see that it was a lawful assignment, else judgment cannot be given on it. McKinley v. Irvine, 13 Ala. 681. And it must be averred that the assignment was in writing. 1 Dan. Pr. 419, 420. And under seal—and must appear to be a valid assignment. 15 Mass. Rep. 236; 5 Halst. 156; 5 Wend. 575.

3. A mortgage may in some cases be held to secure future advances, but it is by tacking to existing debts, secured by

mortgage already. 4 Kent's Com. 175.; 4 Conn. R. 158; 6 Ib. 37.

4. The bill makes the attempt falsely to give precedence to the mortgage of Talman, when it is evident that if the lien of Ralston is a good one, it must have precedence over that of Talman. The decree pursues the same order of payment, and it is therefore erroneous in that respect.

5. The proper parties are not before the court, and therefore, no proper decree could be rendered, and the cause must stand over for proper parties. The bill does not charge a conveyance of title from the trust company of Talman's mortgage; the legal title is therefore in the trust company. No proper decree can be made, unless the legal title be before the court, so as to be bound by the decree, and disposed of. An assignment of a mortgage does not carry the legal title to the land. 11 Wend. 533. The trust company should therefore be made a party to the bill. The mere naming a party as a defendant, does not make him a defendant. 1 Dan. Pr. 334; 2 Dick, 707; 1 A. K. Marsh. 594. To make parties, the bill must be amended, with apt and proper words to charge them. 1 Dan. Pr. 341.

6. The decree was not a proper one. It reverses the proper order of priority, by decreeing payment of Talman first. It does not ascertain what the property is which is subject to sale. How does it stand as to the personal property? It does not allow the redemption of one mortgage separately. It makes no disposition of the fund in the hands of Eslava, and does not ascertain the amount of it. It subjects the whole of the property in the bill, mortgages and exhibits described.

HAMILTON, contra.

The point, I call the attention of the court to first, is the fact, that none of the defendants answered, or demurred to the bill below, or made any objection to it, till after a decree had been rendered, when the plaintiff in error for the first time began to move, and petitioned the chancellor for a rehearing, and that the bill be dismissed. This court will not therefore lightly disturb the decree and proceedings below; but will make all proper necessary intendments to support

them : in this state of facts, this case is to be examined. Does the record, then, show a right in Talman to the relief he seeks ? He alledges that he is the assignee of both the note and the mortgage ; the presumption is, the allegation was proved to the satisfaction of the chancellor. The bill was taken *pro confesso* against the defendants. The presumption then is, that Talman possessed all the rights given by the mortgage, and that he holds the same by a valid legal assignment. To decide the contrary, would be to decide on a presumption only, and against the record—in other words, it would be to presume error in the court below, which this court never does. 3 Ala. 458; Emanuel et al. v. Hunt, 2 Ala. 191; Ib. 415. And the original mortgagee having parted with all interest in the mortgage, is not a necessary party. Walker v. B'k Mobile, 6 Ala. 452.

The same presumption must be made in favor of the fact of the indebtedness of the rail road company to Messrs. Ralston. The bill is taken *pro coufesso :* the fact and amount of this indebtedness is found by the master's report, which was confirmed by the chancellor, without exception taken, after the time prescribed by the sale. It is too late to make the objection for the first time in a court of errors, when it was not made, or hinted at below.

The complainants, Ralston, contracted for a lien as their security; and such was agreed to be given, and was given, by the rail road company; and that their claim is that of equitable mortgagees. The agreement and resolutions speak of a pledge, it is true ; and strictly speaking, there can be no pledge of real property. The charter of the company uses the word pledge, when speaking of both real and personal property. Acts 1835, p. 83, § 8. The word "pledge," must be something that can be done. Equity is not confined to the strict and technical meaning of words—it looks beyond, and seeks the meaning of the parties.

No one can hesitate as to the object of the parties here— on the one side, it was to purchase articles necessary to the company, on the security of their property, and on the other, it was to sell or procure for the company, those articles, on the faith of the lien offered by the company.

Even on the ground assumed by the counsel for the plain-

tiff in error, that this is an agreement for a mortgage only, which would authorize the party to demand a mortgage, the complainants, Ralston, are entitled to the relief sought, upon the principle, that equity always regards that as performed, which was agreed to be done.   1 Story's Eq. 79, 80; and see Hankey v. Vernon, 2 Cox R. 12.   And being in a court of equity, the Messrs. Ralston call for the application of the rule in their case.   They parted with their property on the faith of a lien which was given them; or if the counsel please, which was agreed to be given them, their property was received by the company, used by it, and finally assigned to the plaintiff in error and others, who were stockholders and directors of the company, and must be supposed cognizant of the facts.   Here was an express written agreement for a lien, or mortgage : such an agreement constitutes an equitable mortgage.   1 Bro. C. C. 352.

A written agreement, promising to pay a sum of money, with interest, "of the estate of the deceased W. H," and signed by the parties in interest, is an equitable mortgage. Stuart v. Toulmin, cited 3 Powell on Mortgages, 1049, a— tit. Eq. Mortg. *quod vid.*; and see Burn v. Burn, 3 Ves. 582; s. c., 2 Sch. & Lef. 381; 2 Powell Mortg. 435, 522; 2 Des. Eq. R. 552; 2 Cox R. 12; 1 Ib. 211.   12 Vesey R. 197, et seq., in which the Master of the Rolls, (Sir William Grant,) though strongly condemning the English doctrine of mortgage by deposit of title deeds, clearly recognizes the rule contended for, and says, "if any act appears so unerringly speaking its purpose, that a court could infer and execute such purpose, without the aid of extrinsic testimony, a written declaration of the purpose might appear altogether superfluous."   Here is a written declaration, and made under the instructions of the company, and by an authorized agent, and fully declaring the intention to pledge or mortgage ; in other words, to secure this debt by a lien.

Here, though there is no description of the land, there is much better notice of the existence of a lien, than the record of a judgment would furnish ; and this agreement is spread upon the records of the county in a form much more likely to get to the knowledge of a creditor, than the record of a judgment.

But this is not a contest between creditors. The party objecting is one of the stockholders, and a director of the company, and is one of the general assignees of the company: such assignees or trustees are not such purchasers or creditors, without notice as the law will protect—they stand in the place of the assignor, and can claim only such rights as the assignor had. 1 Paige's R. 125; 11 Ala. 1080; 1 Ired. E. 369.

The right of the Ralstons in this case, cannot be attacked, because of the want of description of lands mortgaged and debt to be secured, in the agreement. I am aware that two or more cases can be found in Connecticut ruling this, (4 and 5 Conn. R.) but those cases cannot be binding in this case, for two reasons. 1. The controversy in each of those cases, was between two sets of mortgagees. The defence was made by the subsequent mortgagee, that the description was too indefinite, and the policy of the registry laws was invoked to sustain the objection; the objection could not have been permitted to be made by the debtor and mortgagor. As to him the mortgage was binding, whether registered or not. So here, the lien is binding as to the company, and its general assignees. (Vide cases supra.) This case then is widely distinct from the cases in Connecticut.

2. Another reason, why those cases should not govern, is this. The doctrine of this court, with regard to deeds for the benefit of creditors, is that the want of the description of the debts to be secured, and of the property conveyed, shall not, of itself, invalidate the deed. The want of this description may, in connection with other circumstances, raise a suspicion of fraud, but of itself it works no injury. Wiswall v. Ticknor & Day, 6 Ala. 178; 5 ib. 324; see Duval's heirs v. McLoskey, 1 ib. 708.

In this case, though there is no description of the land, there is a description of the consideration of the agreement—the debt to be provided for.

Neither is the lien of the Ralstons void, because it was given for future advances. The Connecticut cases do not decide that a mortgage may not be given, and be valid as between mortgagor and mortgagee, for future advances; but that as to subsequent mortgagees, under the registry laws of

the State, it was void. Mortgages may be well executed to secure future debts. 5 Binn. 585 ; 7 Cranch, 34; 1 Pick. 389 ; 2 Cowen, 246; 1 Peters, 448. In England, an equitable mortgage by deposit of title deeds, may be made to secure future advances. 3 Powell on Mort. 1056, c. d. et seq.

An equitable mortgagee may file a bill to establish his lien, and for a sale of the property. 3 Pow. 1060, a. And such is the object of this bill. Vide Burn v. Burn, 3 Vesey, 582, quoting Stewart's case, and s. c. 2 Sch. & Lef. 380 ; and will be preferred to a legal mortgagee with notice. 3 Powell, 1058, a.

The claims of both Talman and the Ralstons, are superior to those of Portier. Portier and his co-trustees claim by virtue of the voluntary assignment of the company to them, to secure themselves and others, all members of the company, for liabilities they had come under. They therefore have, and can here set up, only the right remaining in the company after the conveyances held by Talman and Ralstons. They must have had notice, being members of the company. Howe's case, 1 Paige, 125 ; Miller & Co. v. Walker, 11 Ala. 1080.

Whether the bill be multifarious or not, it is too late for the defendants to make the objection in this court. That should have been done below, on a demurrer. The objection is never favored, nor admitted even, in an appellate court. The petition for re-hearing of the cause, and for dismissal of the bill, was too late. The objection must be taken before the hearing—but this was an attempt to obtain a re-hearing only to make the objection. 10 Yerger, 383 ; 10 Gill & J. 480 ; 2 Ib. 14; 10 Ala. 305 ; and see Kennedy v. Kennedy, 2 Ala. 571 ; and 5 Ala. 402. And even if not too late, the objection must be very glaring, to induce the court to sustain it. Whitney v. Whitney, 5 Dana, 329. The objection even on demurrer would not be well taken. Two mortgagees may join in one bill. Wendall v. Wendall, 3 Paige, 509.

The decree of the chancellor, as to interest, is not erroneous ; for it can be rendered certain by reference to the contract, and the law of the State, on the subject of interest in other States. Vide p. 80 and 468, Acts of 1847-8.

CHILTON, J.—This bill was filed by George F. Talman, Ashbel Ralston and Gerard Ralston against the Mobile and Cedar Point Rail Road Company, Miguel De Eslava, Alexis D. Durand, and Michael Portier, and charges that on the 19th June, 1839, the Mobile and Cedar P. R. R. Co. being indebted to the American Life Insurance and Trust Co., a corporation situate in the State of Maryland, in the sum of $5,810 50, the better to secure the same, executed to said Trust Co., of that date, a mortgage, granting to said Company certain real estate in the city of Mobile, to secure the payment of said indebtedness, which was evidenced by note, due the 16th day of June, 1840. That Talman is the assignee of said note note and mortgage, which remains unpaid, and the mortgage has become forfeit.

A. and G. Ralston represent, that on the 16th July, 1836, the Mobile & C. P. R. R. Co., by resolution passed on the 14th July, 1836, authorized one Moore to pledge all the real and personal estate of said company, in procuring for said company by contract, iron, locomotives, tenders, cars, &c. That Moore applied to said A. and G. Ralston to furnish the iron, and offered to pledge the company's real and personal estate for any advances they might make. That they (A. & G. Ralston) did agree to furnish the iron upon the pledge by Moore of all the real and personal estate of the company, and on the 31st August, 1836, said Moore, by virtue of a resolution of the corporation, and a letter from the president, secretary and treasurer thereof, requesting him to conclude the purchase, and authorizing him to pledge the estate of the company, entered into a written agreement, signed by him and A. and G. Ralston, by which the Ralstons as agents of the company, agreed to purchase and pay for a certain amount of rail road iron in England, and caused it to be insured and shipped to Mobile, and the Mobile and C. P. R. R. Co. agreed " to pay to their said agents, the said A. and G. Ralston, or order, in cash, in Philadelphia, or equivalent thereto, at the rate of exchange on London, at which the Bank of the United States at Philadelphia may be then drawing, upon the arrival of the iron at Mobile. The bills for the same, including one per cent. banker's commissions, and interest from the time of payment in England, up to the time

requisite to reimburse the same in London, at the rate of six per cent. per annum ; together with a commission of five per cent. on the amount of the invoice, and charges for purchasing and shipping the said iron." The agreement then states, "for the faithful performance of this contract on the part of the Mobile and C. P. R. R. Co., the said J. B. Moore, engineer for said company, pledges the real and personal estate of said company, as authorized to do by the instruction of F: Ravisies, president, A. J. Durand, secretary, and A. C. Hollinger, treasurer, committee appointed on the 16th day of July, 1836, to purchase materials for said road, as per documents annexed. Dated at Philadelphia. (Signed,)

J. B. MOORE,

A. & G. RALSTON."

The Ralstons then aver, that there is due to them, and unpaid from the company, on account of the purchase of iron under said contract, the sum of $7,000 and upwards, accruing under said contract. They charge, that in addition to the real estate embraced in the mortgage, which comprises a lot of about one acre, in the city of Mobile, the company owned at the time of the agreement, and which they alledge is subject to their equities, a tract of land, situate on Mon Louis Island ; containing fourteen hundred acres, and which the bill particularly describes, besides another tract, which is described as containing sixteen hundred and fifty acres. These complainants (A. and G. Ralston) insist that the company were also possessed of a large portion of iron, steam engines, cars, &c., which were pledged by said agreement. Complainants charge, that Miguel D. Eslava has converted said chattels, or a large portion thereof, to his own use, having a full knowledge of the complainants' equities. That said company, using the name of the Mobile and New Orleans Rail Road Company, on the 9th January, 1840, conveyed all their before mentioned estate to Michael Portier, Miguel D. Eslava and Alexis D. Durand, with full power to sell and dispose of the same, the proceeds of the sale to be applied to the payment of certain debts due from the company to certain of the stockholders thereof. That these persons took the conveyance with a full knowledge of complain-

ants' equities, and that said conveyance was executed in sub-jection to their prior lien. That Eslava also claims to hold a portion of said estate under a purchase at sheriff's sale, but they charge his right is subordinate to theirs. The bill prays an account to be taken of the amount due on the mort-gage of Talman, and to A. and G. Ralston. That Talman's mortgage be foreclosed by sale of the property—the surplus, after satisfying his demand, to be applied to the payment of Ralston's claim. That the other estate of the company be sold, the equity of redemption of all parties be foreclosed and barred, and that Eslava bring into court the sums he may have received from sales made of said personal estate; that the same be paid on Ralstons' demand.

By a resolution of the company, a copy of which is exhib-ited with the bill, it appears, the persons who wrote the let-ter to said Moore, requesting him to procure the materials, &c. for the road, were appointed a committee to procure said materials, with power to make an agent or agents, to effect the object proposed.

The deed of trust under which the defendants below claimed, was executed to Michael Portier, Miguel D. Eslava and Alexis D. Durand, the 9th January, 1840, and purports to have been done by resolution of the board, entered into the day previous to its execution, which recited that the company, having failed to negotiate a loan, by virtue of a previous resolution, to meet the exigencies of the company, did, on the 7th July, 1837, resolve that the real and personal estate then belonging to it, should be pledged to indemnify and save harmless, such of the stockholders as should, from time to time, lend their names to the company, for the pur-pose of raising money for its use. That in virtue of this last resolution, F. Ravisies and Alexis D. Durand, on the 10th July, 1837, executed their note, payable to, and indorsed by M. D. Eslava, for $3,000, which was negotiated in the Branch of the Bank of the State of Alabama at Mobile, and the proceeds applied to pay off the debts of the company. An-other note, made about the same time, was negotiated and applied in the same manner, made by E. De Vandell and Du-rand, and indorsed by M. Portier, for $200. A third note discounted at the Bank of Mobile, and the proceeds in like

manner applied, was made by M. Portier, payable to, and indorsed by S. H. Garrow, and further indorsed by Durand, Joseph Hall and M. D. Eslava, for $5,000. A fourth note, made by Eslava, and indorsed by Isaac H. Erwin and A. S. Dumee, discounted at the Planters' & Merchants' Bank of Mobile, dated 28th July, 1737, and due at ninety days, was applied to the payment of the company's debts. The resolution further recites, that F. Ravisies, being president of the company on the 22d August, 1837, drew a draft on the company, and accepted it as president thereof, in favor of, and indorsed by Eslava, and also indorsed by Durand, payable at New York, the 15th March, 1838, and purchased by Geo. Poe, jr. and the proceeds thereof ($5,000) applied to the extinguishment of the debts of the company. These demands not having been settled by the company, it was ordered that this deed of trust be, and the same was accordingly given, to secure, and save said parties harmless, &c.

Pending the suit, at the spring term, 1844, the death of Durand was suggested, and a *scire facias* issued to Julius Delchamps, his executor, which was duly executed the 4th February, 1845. In April, 1845, an order of the court was made by consent, appointing Adrian S. Dumee, trustee under the deed to Portier, Eslava and Durand, to act in the place of Durand, deceased, and to represent the trust in this cause. In April, 1846, the bill was taken for confessed against Portier and Eslava, on personal service. In December, 1846, Messrs. Stewart & Easton came into court and entered an appearance for all the defendants, except M. D. Eslava. Afterwards, on the 6th April, 1847, a decree *pro confesso* was entered against the rail road company, Eslava, Portier and Dumee, the entry reciting, that "the mortgage and notes being produced and proved, are, with the bill, referred to the master to ascertain, and report the amount due, and to state the amount between the parties. The master having reported as due to Talman, on the 1st January, 1847, the sum of $4,528 40, and to the Messrs. Ralstons, on the 31st December, 1843, $7,832 04, upon which had been paid, April 22, 1844, the sum of $4,041 20; and on the 29th May, 1845, $681 11, with interest on the respective items up to 8th April, 1847. The chancellor then confirmed the report,

and decreed finally, that unless the defendants should pay into court the amount so ascertained by the master, by the 1st May following, the register should proceed to sell the property described in the complainants' bill, and mortgages and exhibits, or so much thereof as may be necessary to satisfy the complainants' debts, with interest and cost of suit, to be sold at the court house in Mobile county, at public auction, between the usual hours of sheriffs' sales, due and legal notice thereof being given by publication, &c.; "and out of the proceeds of such sale, he will pay and satisfy the complainants' debts, in the order pointed out in the bill, with interest, and the costs of suit, and any balance that may remain, he will bring into court to abide its future order.

At the same time, a petition for a re-hearing was filed, by which M. Portier avers, "that he has a meritorious defence to the bill, which from circumstances, he was not able to present before the decree was made ; that the execution of the decree would be highly injurious to him ; that he is advised the bill is defective, and bad on demurrer, and that the court should dismiss it for want of equity, upon being advised as to the defects appearing on its face, &c. The court refused to open, or set aside the decree. It does not appear that any process of subpœna was ever served upon Alexis D. Durand, or that Dumee had been made a party, otherwise than by the order appointing him trustee in place of Durand. The defendants, having brought the case to this court by writ of error, now insist that the decree is erroneous: Because—

1. The bill is multifarious.

2. The allegations of the bill are too indistinct, and uncertain, to justify the decree.

3. The court erred in rendering a decree *pro confesso* against A. S. Dumee, when he had not been made a party defendant, by any allegation of the bill.

4. That no decree should have been rendered, without a decree *pro confesso* against Delchamps, on whom process had been served as the executor of Durand.

5. That the decree is uncertain—it does not ascertain what property shall be sold—who has it, nor how much of it.

6. The decree omits the value of the property converted by Eslava to his own use, and makes no disposition of it.

7. The decree determines that the claims of complainants are paramount to the deed of trust under which the plaintiffs in error claim, when, it is insisted, the face of the bill shows the contrary.

8. The decree does not ascertain the amount to be paid, nor establish the rate of interest to be calculated.

9. The decree is against the Mobile and Cedar Point Rail Road Company, whereas the style of the company has been altered by an act of the legislature to that of the President and Directors of the Mobile and New Orleans Rail Road Company.

We will notice these assignments in their order; and

1. We regard the bill as not obnoxious to the objection of multifariousness. The Ralstons assert a lien on all the property, while Talman only claims a portion. It is conceded by the bill, that the lien of the latter is to be preferred, but the Ralstons will take the surplus, if their claims succeed, so that in respect to the lot on which Talman's mortgage creates a lien, the complainants have a common interest, and the defendants claim the whole. The principle involved is not unlike the point decided in Donalson's ex'r v. Pope & Posey, 13 Ala. Rep. 752. See also Wendell v. Wendell, 3 Paige, 509. If, however, the objection were available, it cannot be made for the first time in this court. It is a matter of form, not usually affecting the merits of the decree, and is always discouraged by the courts, when it tends to impede, rather than promote, the ends of justice. Kennedy's heirs v. Kennedy's ex'rs, 2 Ala. Rep. 571; Chapman v. Chunn, 5 Ala. Rep. 397; McGowan et al. v. Br. B'k of Mobile, 7 Ala. Rep. 823-8; 1 Dan. Ch. Pr. 350, and authorities in note 2; Sto. Eq. Pl. ° 544, and notes. It must be pointed out by demurrer, or is considered as waived. Welborne et al. v. Tiller et al. 10 Ala. Rep. 310.

2. It is certainly true, as an elementary principle of equity pleading, that the plaintiff must show clearly, by his bill, that he has a right to the thing demanded, or such an interest in the subject matter of complaint, as gives him a right to institute a suit concerning it. 1 Dan. Ch. Pr. 360; Story's Eq.

Pl. § 23; McKinley et al. v. Irvine, 13 Ala. Rep. 693. It is supposed by the plaintiffs' counsel, the averments in the bill as to Talman's title, are not in conformity to this rule. The bill, after charging the indebtedness of the Mobile and Cedar Point R. R. Co., to the American Life Insurance and Trust Co., and the execution of a note and mortgage to secure the payment of that indebtedness, states, "that he (Talman) is the assignee of the said American Life Insurance and Trust Co., of the said indenture of mortgage, and the said promissory note, and entitled to all their rights and remedies, therein and thereupon," and an exhibit is made of the mortgage, which is made part of the bill.

This averment of title is sufficient. The defendants are fully advised of the facts constituting the claim, or title of the plaintiff—he derives his title from the mortgagee directly by assignment. The case of McKinley v. Irvine does not in the slightest degree militate against this proposition. In that case, the plaintiff derived his title to three shares of stock by purchase from the *heirs and distributees* of one James Montgomery, deceased. That title was put in issue. He then attempted to sustain his bill, by proof of a title derived from James Montgomery by his vendors, not as heirs and distributees, but by virtue of the will of said Montgomery, as devisees. This title, we held, was not put in issue by the pleadings; that proof of a will was without the issue, and the plaintiff could not recover upon a title not averred. The case at bar is wholly dissimilar.

It is however said, that the plaintiff should have averred the assignment was by writing, and we are referred to 1 Daniel's Pr. 419, 420. The authority merely affirms, that where a thing is originally created by statute, and required to be in writing, it must then be stated, with all the circumstances required to render it valid. Such, for example, as a title to lands claimed by *devise*, (which, by the common law, was not valid,) must be alledged to have been devised by writing, which is the only form the statute recognizes as valid. But it is a well settled rule, both at law and in equity, that where the act averred might originally have been done at the common law by parol, and the statute requires it to be in writing, the form of pleading it is not affected by the stat-

ute, but remains the same as before the passage of the act. 1 Dan. Ch. Pr. 416; Stephens's Pl. 313. Now, as an equitable interest in a *chose in action*, as well as the legal title to real estate, could pass at the common law without writing, it follows, that to aver an assignment of the note and mortgage by the payee and mortgagee to the plaintiff, is sufficient. If the statute requires writing, then the party must in his proof, exhibit a compliance with its requisitions, if such proof be demanded by the opposing party. In the case before us, the defendants, by their default after personal service, admit the assignment by the payee and the mortgagee, of the note and mortgage, and that the complainant thereby acquired all the rights and remedies which originally vested in the said American Life Insurance and Trust Company. Having been tendered the opportunity of raising all questions respecting the legality or formality of the assignment, and failing to do so, but permitting the decree to pass without objection, it is too late for the defendants to say, it *may* be, the assignment was irregular, or informal; it *may want* the seal of the corporation to render it valid, &c. 5 Ala. Rep. 173.

3. There was no necessity for amending the bill making Dumee a party in the place of Durand, who had died. He was admitted, upon the motion of Portier and Eslava, the two surviving trustees in the deed of trust to them by the rail road company, "to act with them, and to represent the trust fund before the court in this case, as a defendant." The record shows this order was made by consent, and any irregularity, which might otherwise render the appointment erroneous, is consequently waived. 4 Por. 245.

Having appeared by counsel, and failing to answer within the time prescribed by the rules of court, there was no error in taking the bill for confessed against Dumee.

4. The bill prays that Durand may be made a party defendant. No process was ever served upon him, and although a *scire facias* was issued, and was served on Delchamps, as his executor, no other steps were taken to make him a party, and it is very clear, that under such circumstances, he cannot be regarded as a party to the bill. 1 Dan. Ch. Pr. 341. It is true, that upon the decease of a sole trustee, his interest passes to his executor, and if suit be instituted by such trus-

tee, it should be revived in the name of the executor. Mauldin, Montague & Co. v. Armistead, ex'r, 14 Ala. Rep. 702. In this case, two of the trustees survive, and the deed authorizes the company to substitute a trustee in the event of the death, or refusal to act, of those appointed. Upon Durand's death, Dumee was, as we have said, appointed trustee in his place, not, it is true, by a formal resolution of the company, but by its consent in court, which consent operates as an estoppel, so far as respects his appointment.

The deed transfers to the trustees, and their successors, the exclusive management of the property conveyed, and they must be regarded as representing the interest of the *cestui que trusts*. Such being the case, the decision in Walker et al. v. Miller & Co. 11 Ala. Rep. 1086, is in point to show, that the *cestui que trusts* need not be made parties. Durand was not made a party as *cestui que trust*, but as trustee, and his place has been supplied by the substitution of Dumee. There was, then, no error in failing to revive against his executor.

5. We come next to consider the objections to the decree, as presented by the five remaining assignments of error. And before taking them up *seriatim*, let us determine the right of the Ralstons (so strongly contested by the counsel for the plaintiff in error) to any decree foreclosing what is termed by their counsel, their equitable mortgage.

It is proper, in the first place, to remark, that the term "pledge," as used in the charter of the rail road company, as well as the resolutions passed by it, and the agreement entered into by its agent, Moore, should not be construed in its technical sense, as a mere right to deposit its effects in pawn for the security of its creditors, but should be understood in the more enlarged sense, of conferring the power to create liens upon its estate, both real and personal, for the security of demands which should exist against it. It is manifest, the company could not have carried out their enterprize, if the property were required to be delivered over to those who might advance money for the purpose of erecting the road; so that the idea of a *pledge*, technically so called, which requires a delivery, is opposed to the object and design, both of

the company in obtaining loans, and of the legislature in conferring power to secure their re-payment.

It is insisted, that the claim of the Ralstons is not sufficient to warrant a decree in their favor; that the agreement entered into by Moore, as the agent for the company, is not a mortgage; that it is not sealed. It is most certainly not a technical mortgage, which must convey the land from the debtor to the creditor, as a pledge and security for the payment of a sum of money borrowed, and which contains a proviso that the conveyance is to be void on the payment of the money, and interest, on a certain day. But a court of equity will look to the intention of the parties, to be gathered from the instrument, rather than to its form, and will give effect to that intention, if lawful, and it may do so without interfering with paramount equities. The resolution of the board of directors, appointing a committee to negotiate for the iron, &c. for the benefit of the rail road company, fully authorized that committee to appoint an agent to contract for the articles specified in the resolution, and to pledge the real and personal estate of the company, for the fulfilment of the contract. This the agent in good faith did, and on the assurance of his written pledge, of all the personal and real estate belonging to the company, the Messrs. Ralstons furnished the iron to construct the road. The company received the iron under this agreement, without objection, so far as we are advised by the record, to the acts of its agent, Moore. Having availed itself of the benefit of the contract, it would be repugnant to the plainest dictates of justice, to permit it now to say, the contract is invalid—it wants the formality of a seal—it purports to be a *pledge*, and is void, without delivery—the agent transcended his authority, in vesting in the Ralstons too great a latitude, as to the price to be paid for the articles, &c. Without intimating that any of these objections could have been successfully urged at any time against the validity of this contract, it is most certain, that the company must be deemed to have waived them, when, after a knowledge of the negotiation, the articles contracted for, and secured by the pledge, were received and used by the corporation. This would seem necessarily to result, unless indeed corporate bo-

Vol. 15—62

dies are not bound by the same legal and moral obligations which are imposed upon individuals—a proposition which we are by no means prepared to admit.

But it is insisted, this agreement of the company with the Ralstons cannot be decreed an equitable mortgage, because it is not sufficiently specific, being of *all* the property, both real and personal, of the corporation. This objection does not *per se* render the agreement invalid. A sweeping conveyance of all one's estate, is certainly a badge of fraud, but in this case, no fraud is alledged. The same may be said respecting the uncertainty as to the amount to be secured by the deed, and that the security is for advances to be made *in futuro*. The doctrine is well settled, that a mortgage may provide for future advances. Mr. Justice Story, in delivering the opinion of the court in Conrad v. the Atlantic Insurance Company, 1 Peters's Rep. 448, says, "mortgages may as well be given to secure future advances and contingent debts, as those which already exist, and are certain and due. The only question which arises in such cases, is, the *bona fides* of the transaction." So in England, it has been repeatedly held, that an equitable mortgage created by deposit of title deeds, may be extended so as to cover further advances. See the cases referred to in 3 Powell on Mort. 1056. See also, as to what will constitute an equitable mortgage, the case of Stewart v. Toulmin, decided in 1822, in which the Vice Chancellor of England held that a written instrument, promising to pay a sum of money, with interest, " out of the estate of William Hall," and signed by the parties entitled to the estate, created an equitable mortgage upon the real estate of W. H., after the personalty had been exhausted. Vide 3 Powell Mort. 1049, b.

So also, agreements to mortgage may be implied from defective assurances between debtor and creditor, lender and borrower. Dale v. Smithwich, 2 Ver. 151; Card v. Jaffray, 2 Sch. & Lef. 374, cited, 3 Powell on Mortg. 1050, a.

We conclude, from the general principles of equity applicable to such defective conveyances or contracts, when the design of the parties is manifest, as also from the foregoing authorities, and the decisions of this court, which hold that inaccuracy of description, either as to the debts secured, or

property conveyed, does not invalidate the deed providing for the security of creditors, but merely furnishes an argument of fraud against them, that the contract before us should have the effect of an equitable mortgage against the company, and those who purchase with a knowledge of the existence of such lien. This knowledge is directly charged against the plaintiffs in error by the bill, and admitted by their default. See the authorities of this court, cited on brief of defendants' counsel. See also, Robinson and Caldwell v. Mauldin, Montague & Co. 11 Ala. Rep. 980-1. It is true, as insisted on by the counsel for the plaintiff in error, that the capital stock of a corporation is pledged for the payment of its debts; that is, it is regarded as a trust fund, upon the faith of which the company obtains credit, and may be subjected in a proper case in a court of equity, where the rights of all the creditors will be protected, who choose to come in and participate in the litigation. Ang. & Am. on Corp. 475, et seq.; Vore v. Grant, 15 Mass. Rep. 505; Wood v. Dummer, 3 Mason's C. C. R. 308. In the case last cited, Judge Story says, "the bill holders and other creditors, he considered had the first claims upon it; and the stockholders had no right, until all the other creditors were satisfied." He further held, that the trust fund might be followed into the hands of any person having notice of the trust, and that the stockholders, both in law and fact, must be considered as having the *most ample notice.* But it does not result from this, that the corporation may not execute a trust deed, or mortgage. It is laid down as a general rule, without exception, that corporations at this day are capable of making every species of deed. Ang. & Am. 153. So in Allen v. the Montgomery R. R. Co. 11 Ala. Rep. 437, this court held, that although a corporation, by a special provision in its charter, is empowered to mortgage its effects, for a particular purpose, this will not be construed as taking away or abridging its general power to execute mortgages for the security of creditors; and that case also shows, that an insolvent corporation may execute a valid mortgage, or trust assignment of all its effects, to secure the payment of certain bonds, to be afterwards issued for the purpose of raising money for the uses of the company, and that the *bona fide* holders of such

bonds, who had become such before other creditors had ac-
quired a lien, were to be protected, and preferred to such cre-
ditors. The sixth head note of the case from which we have
quoted, would indicate a different conclusion. This results
from a typographical error; the word inoperative, being mis-
printed, "imperative," which entirely changes the sense.

It is furthermore insisted, that the agreement entered into
between the Ralstons, and Moore, as the agent of the compa-
ny, does not ascertain the debt. The property to be pur-
chased, and paid for by the Messrs. R's, was described, and
not knowing what it would cost, the amount could not have
been more specifically stated, but being contingent as to
amount, could not constitute an objection to a security by
mortgage. See 1 Peters's Rep. 448, *supra*. Neither is it
an available objection, that no time is fixed for redemption.
In all such cases, the law affixes a reasonable time. We are
also of opinion, the averments of the bill are sufficient, as to
a compliance on the part of the Ralstons with the contract,
and the amount they expended in the purchase of the iron.
They charge, "that there is now due to them from the com-
pany, the sum of $7,000 and upwards, *accruing to them un-
der the contract*, and that they proceeded to purchase the iron,
and furnished it to the company according to the stipulations
of the contract, having advanced the money therefor, &c.

6. Having ascertained that the agreement entered into with
the Ralstons, must, according to the established doctrine of
the court of equity, have the effect of an equitable mortgage,
we proceed with the objections to the decree, in the order
proposed. It is insisted, that the decree is uncertain; that it
does not ascertain what property shall be sold—who has it in
possession, nor how much of it shall be exposed to sale; that
it does not ascertain the amount to be paid, nor establish the
rule of interest to be computed.

We think the decree is utterly wanting in that precision
and certainty, so necessary in the final judgments of judicial
tribunals, which are to furnish guides and protection to the
ministerial officers of the court, who may be charged with
their execution, and which ascertain the rights, and fix the
liabilities of the respective parties to the proceedings upon
which they are rendered,

In the first place, it is with some difficulty that we ascertain who the parties really before the court as defendants are, and upon whom the decree is to operate.    The decree itself does not advise us.    Again : the register reports a certain sum due to Talman on the first January, 1847, and another sum due to the Ralstons on the 31st December, 1843, with two credits bearing subsequent dates, and that these sums *must draw interest to the time of making his report*, (10*th April*, 1847.)    But at what rate are they to draw interest ? This remains to be ascertained by proof, as the record furnishes no data for computing the amount.    One of the agreements was made in Philadelphia ; the other we know not where, but are left to infer, in New York, as the corporation to which made, existed in that State.    We cannot judicially know the rate of interest of these States, nor are we aided by the late act of the legislature, to which we are referred, and tho table compiled by the Secretary of State, in accordance thereto.    The act makes the table of the rate of interest of the several States *prima facie* evidence of the rate to be computed upon contracts, &c.; but this evidence may be controverted, and it may be shown that a rate different from that certified to, obtained at the time the contract was made. The decree leaves the matter in this condition, and orders that "*defendants*" pay the amount so reported, into the hands of the register of the court, by the first day of May then next, or on their failure, the register should "proceed to *sell the property described in the complainants' bill, and mortgages and exhibits*, or so much thereof as shall be necessary to satisfy the complainants' debts, and interest, and costs of suit," &c.    The bill, after describing three tracts of real estate as owned by the company at the time of the execution of the equitable mortgage to the complainants, (Ralstons,) avers, that the company was also possessed of large quantities of iron of various descriptions, steam engines, locomotives, cars, and various other chattels, which were pledged by said contract.    That Miguel D. Eslava had converted the said chattels, or a large portion of them, to his own use, by selling the same and receiving the proceeds thereof."    How many of the steam engines, of the locomotives and cars—what portion of the iron, &c. is the register ordered by the decree to

sell? The decree says all the property described by the bill. But a large portion of the personal property has been sold, and the proceeds received, and the property in the hands, perhaps, of *bona fide* innocent purchasers. Shall the register take the property out of their possession, when they have had no opportunity of being heard in defence of their rights? This he must do, if he would comply with the decree. We need not, however, extend these remarks. It is most manifest, the decree cannot be sustained.

In Gayle v. Singleton, 1 Stew. Rep. 566, it is said, a decree ordering the sale of property in the hands of heirs, must specify and identify it. In that case, the decree was to be levied of the personal estate of M. G., deceased, in the hands of his administrators and heirs: held insufficient. So also, a final decree for money must specify the sum, and not leave it to be ascertained by a commissioner. Clark v. Ball, 4 Dana, 16. In McCartney et al. v. Calhoun et al. 11 Ala. Rep. 120, this court reversed the decree of the chancellor, which referred it to the master to ascertain what sum each defendant should pay, and after their non-payment of the sums demanded, to issue execution. The reason assigned is, the defendants would have no opportunity of excepting to his report; so in this case, the master must find the rate of interest, and if he err, the parties could have no opportunity of excepting.

7. As this case will have to be sent back, an opinion upon the other points raised in the argument, which we have not already decided, may be unimportant, inasmuch as the case may assume a different aspect, when the respective claims of the parties are fully presented. We would, however, observe, that we cannot well conceive how the defendants below can be injured by the preference conceded by the Ralston's to Talman's mortgage. If both mortgages take precedence of theirs, it is a matter of perfect indifference to them, which is first satisfied.

Perhaps it would be premature to express a definite opinion as to the character of the mortgage made to the plaintiffs in error. It is however younger than either of the others, and must be postponed to them, unless there be equitable grounds for referring it back to the time the stockholders

loaned their names to raise funds for the company, and thus to overreach the liens of the defendants in error. From the facts contained in the record before us, we feel perfectly satisfied, that such preference cannot be given to it in the present aspect of the case, and it may well be questioned whether, under any state of facts, this effect can be given to it. And whether the stockholders are not estopped by the acts of their agents, from setting up their mortgage to defeat or override the lien which the company created for the benefit of the complainants below.

Our conclusion is, that the decree of the chancellor in the particulars mentioned above, is erroneous. It is therefore. reversed, and the cause must be remanded, for further proceedings.